211 N.J. Super. 26 (1986)
510 A.2d 694
ALFRED E. FASCHING, MARGUERITE FASCHING, HIS WIFE, AND VALERIE COLLINS, PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,
v.
JOSEPH KALLINGER, ELIZABETH B. KALLINGER, HIS WIFE, FLORA RHETA SCHREIBER, SIMON & SCHUSTER, INC., A CORPORATION OF THE STATE OF NEW YORK, DEFENDANTS-APPELLANTS-CROSS-RESPONDENTS, AND PAUL GIBLIN, DEFENDANT-RESPONDENT AND NEW AMERICAN LIBRARY, A NEW YORK PARTNERSHIP, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1986.
Decided May 30, 1986.
*28 Before Judges KING, O'BRIEN and SIMPSON.
Nickolas E. Nasuta argued the cause for appellant Kallinger.
Clive S. Cummis argued the cause for appellant Simon & Schuster (Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, attorneys; Clive S. Cummis, Lee Alan Adlerstein and Kenneth F. Oettle, of counsel and on the brief).
Morrill J. Cole argued the cause for appellant Schreiber (Cole, Schotz, Bernstein, Meisel & Forman, attorneys; Morrill J. Cole and Sidney J. Bernstein, of counsel and on the brief).
Andrea M. Silkowitz, Deputy Attorney General, argued the cause for respondent State of New Jersey (W. Cary Edwards, Attorney General of New Jersey, attorney; Michael R. Cole, First Assistant Attorney General, of counsel).
Frank P. Lucianna and Nancy E. Lucianna argued the cause for respondents Fasching (Lucianna, Bierman & Stillman, attorneys).
David F. Lyttle argued the cause for respondent Giblin (Giblin & Giblin, attorneys; George B. Gelman and Jill L. McNish, of counsel; Michael B. Wallstein, on the brief).
Kiernan Pillion, attorney for Violent Crimes Compensation Board, filed an appearance (Cindy R. Merker, Board Counsel, of counsel).
American Legal Foundation filed an amicus curiae brief (Bergamo & Buonocore, attorneys; Charles Bergamo, of counsel).
Winne, Banta, Rizzi, Hetherington & Basralian filed an amicus curiae brief on behalf of Independent Literary Agents *29 Association (Peter G. Banta, of counsel; Kenneth P. Norwick of the New York Bar, on the brief).
Greenwood & Sayovitz filed an amicus curiae brief on behalf of The Association of American Publishers, Inc. (Sidney A. Sayovitz and Clement H. Berne, of counsel; R. Bruce Rich and Robin E. Silverman, pro hac vice on the brief).
Deborah H. Karpatkin filed an amicus curiae brief on behalf of American Civil Liberties Union of New Jersey.
Knipe & Helms filed an amicus curiae brief on behalf of The Authors League of American, Inc. (Peter Knipe and Irwin Karp of the New York Bar, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case involves claims for money damages by three surviving next-of-kin of a murder victim against the convicted murderer, and the author and publisher of a book, The Shoemaker, which recounts the murderer's life history and supposedly describes the criminal episode. The actions are based in part on traditional common-law theories of libel, invasion of privacy, and unjust enrichment, and in part on the so-called "Son of Sam Law,"[1] designed to prevent certain persons from profiting from the descriptions of criminal events, N.J.S.A. 52:4B-26, et seq.; L. 1983, c. 33, §§ 1-8. We granted leave to appeal and cross-appeal in order to determine the propriety of the legal rulings of the Law Division judge dismissing the plaintiffs' common-law claims and upholding their statutory claims as to the author and the publisher. R. 2:2-4. We conclude that this statute was not intended by the Legislature to apply to authors *30 and publishers. Thus we do not reach any First Amendment issues which would arise if the statute did apply to authors or publishers. Nor do we reach the First Amendment issue as to Kallinger despite the statute's obvious applicability to the convicted murderer, because he suffered no adverse ruling in the Law Division and has no grounds to pursue his appeal here.

I

THE PARTIES
The plaintiffs are the parents and sister of Maria Fasching, a New Jersey resident who was murdered by defendant Kallinger on January 8, 1975. He was convicted of her murder in Bergen County on October 12, 1976 and sentenced to life imprisonment. The conviction and sentence were affirmed by this court in an unreported opinion in 1979. The life term was imposed consecutive to a 30 to 80-year sentence then being served at the Huntington Correctional Facility for offenses committed in Pennsylvania. Kallinger is currently held in the Fairview Hospital for the criminally insane in Wayne County, Pennsylvania. Kallinger's wife, Elizabeth, was named as a defendant but never appeared and is not represented on this appeal.
Defendant Flora Schreiber is a professor of English and Speech and Assistant to the President of the City University of New York's John Jay College of Criminal Justice. She is the author of the book, The Shoemaker: Anatomy of a Psychotic, a "psycho-biography of Joseph Kallinger" which is the subject of this litigation. She is also the author of Sybil, a best-selling book about a woman with multiple personalities. Defendant Simon and Schuster, a New York corporation, is the hardcover publisher of The Shoemaker. Defendant New American Library (NAL), a publishing house also from New York, published the book in paperback. The remaining defendant, Paul Giblin, is a member of the bar of this State. He represented Kallinger at his murder trial in Bergen County.

*31 THE CONTRACTS
In 1976, Simon & Schuster contracted with author Flora Schreiber with regard to a biography she planned to write on Joseph Kallinger, a Philadelphia shoemaker who had committed two murders in Pennsylvania and the murder in New Jersey in the early and mid-1970's. Under the terms of the contract, Simon & Schuster obtained rights to publish the hardcover edition of the book and to license its publication as a paperback. By separate agreement in 1983, Simon & Schuster granted the paperback license to NAL which published the paperback edition in 1984. Neither Simon & Schuster nor NAL ever contracted directly with the Kallingers.
Prior to contracting with Simon & Schuster, Schreiber had obtained the rights to Kallinger's story through an agreement with Kallinger and his wife. This "Agreement Release" provided that the Kallingers would receive 12 1/2% of any monies received by Schreiber from the publication of the biography. Schreiber attached a copy of the "Agreement Release" to her contract with Simon & Schuster to substantiate her warranty that she controlled the exclusive rights to Kallinger's life story. She received advances of $475,000 and has earned about $75,000 in royalties. The book has not been a commercial success according to the representations of the publisher's counsel. In the course of representing Kallinger, Paul Giblin's legal fees and disbursements totalled $311,888.53. On July 6 and August 1, 1976 Giblin entered into separate contracts with the Kallingers who agreed to assign all rights in the contract with Schreiber to Giblin to be credited toward these expenses.
Pursuant to this assignment, Schreiber forwarded $14,062.52 to Giblin in August 1976. After failing to receive any further payments from Schreiber, Kallingers or Simon & Schuster, Giblin filed suit in June 1983 in Superior Court, Bergen County (Giblin v. Kallinger, et al, Docket No. L-038306-83), seeking enforcement of the assignments. Giblin, Schreiber and Simon & Schuster became parties to a settlement entered on August 8, *32 1983 whereby Schreiber agreed to pay Giblin 12 1/2% of her net earnings from The Shoemaker until his legal fees and disbursements were paid in full, to provide periodic accounting of those earnings, and to immediately pay Giblin $14,062.50. Notwithstanding this latter provision, it is Giblin's recollection that he received only $12,575 by way of settlement in August 1983. Kallinger himself has received nothing from the book's proceeds.

THE BOOK
The Shoemaker, published in hardback in 1983, is a study of the life of defendant Kallinger. The book received some measure of critical acclaim by professionals in the mental health and law enforcement fields. Based upon extensive interviews with Kallinger and upon data provided by family, neighbors, psychiatrists, and other persons who knew him, The Shoemaker follows Kallinger's life from birth to his present incarceration in an institution for the criminally insane. Interspersed throughout the narrative, which is divided into three parts, are the author's observations concerning the impact of Kallinger's lifetime experiences upon his criminal conduct. In "Book 1" (pp. 23-66) Schreiber describes a childhood in which Kallinger is reared by cold and reclusive stepparents who physically and emotionally mistreat him. In "Book 2" (pp. 69-128) she examines his young adulthood, during which Kallinger began to exhibit overt antisocial conduct, including physical abuse of his family and commission of petty crimes. In "Book 3" (pp. 131-272) Schreiber recounts and analyzes Kallinger's adult life. She relates his descent into a personal hallucinatory "Hell" where, she believes, prodded by his invisible double, "Charlie", Kallinger committed burglary, robbery and finally murders, including that of Maria Fasching.
All references to Maria Fasching are contained in one chapter of "Book 3". The chapter's contents may be summarized as follows: In pursuit of a perceived calling to "destroy mankind *33 through castration," Kallinger invaded a Leonia, New Jersey home, subjected its occupants to numerous abuses and ultimately selected Maria Fasching to act as his "delegate" to perform an act of sexual mutilation on another. When she refused, Kallinger stabbed her to death. The actual description of Kallinger's murder of Maria Fasching appears in the context of this book-length study of a convicted killer and consumes about 13 pages of the 423-page text.

THE STATUTE
The 1983 Amendment to New Jersey's Criminal Injuries Compensation Act of 1971, N.J.S.A. 52:4B-26 et seq., took effect on January 26, 1983. It is entitled "An Act Concerning Certain Moneys Received by Persons Accused of Crime." Its provisions affect contracts entered into with persons
convicted or accused of a crime in this State or an agent, assignee, beneficiary, conservator, executor, guardian, representative, relative, friend, associate or conspirator of a person convicted or accused of a crime in this State. [N.J.S.A 52:4B-26, 28].
If such a contract concerns media "reenactment" of a criminal act or "expressions" of a criminal's "thoughts, feelings, opinions or emotions" regarding a crime, it is declared void unless it contains a provision for payment to the Violent Crimes Compensation Board of monies that would otherwise, by its terms, be owing the person convicted or accused or his agent, assignee, etc. N.J.S.A. 52:4B-26. An accused can gain access to these funds only through court order after a showing that the money will be used for his defense. N.J.S.A. 52:4B-32.
Upon receipt of the funds, the Board must deposit the money into an interest-bearing escrow account. N.J.S.A. 52:4B-28. If an accused person is acquitted, the escrowed funds are to be returned to him "immediately." N.J.S.A. 52:4B-30. If he is convicted, the statute specifies the priorities in which the funds must be expended, including satisfaction of civil judgments of the criminal's victim or the victim's representative, restitution ordered by the court, and satisfaction of other judgment creditors *34 of the criminal. Any funds remaining in the escrow account are not returned to the criminal but are instead placed with the Board to satisfy claims, filed pursuant to the Criminal Injuries Compensation Act, of other crime victims. N.J.S.A. 52:4B-30.

II

THE OPINIONS OF THE LAW DIVISION
In his opinion of June 19, 1985 which granted summary judgment dismissing the common-law counts of plaintiffs' amended complaint, the Law Division judge held that no cause of action existed for defamation of a dead person. Since The Shoemaker was published seven years after the victim's death in 1975, he held that the right of privacy died with the person and dismissed that count. Finally, the judge found no unjust enrichment from publication of the book because plaintiffs never expected remuneration from defendants nor did any special relations exist between the parties which would create any expectation of benefits.
In his opinion of July 24, 1985 the judge effectively granted summary judgment to the plaintiffs on the statutory counts of the amended complaint. The judge found that the statute did not inhibit publications about crime in violation of the First Amendment but merely provided "reasonable time, place and manner guidelines in which to publish such accounts of the criminal mind." He also rejected defendants' argument that the statute restricted the press' right of access to information, finding that a criminal who wishes to speak to the media "will speak regardless of any monetary incentives." He found the statute "a reasonable restriction on that portion of speech which causes the convicted criminal or his assigns to profit."
The judge found that even if he did conclude that the statute incidentally burdened expression, it "effectively and narrowly furthered a compelling state interest." He employed the three-prong test articulated by the United States Supreme Court in *35 Minneapolis Star and Tribune v. Minn. Comm'n of Rev., 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), in determining that it passed constitutional muster. That test requires (1) the state to have an interest of compelling importance sufficient to necessitate the burden imposed by the statute on protected activity; (2) the statute to be narrowly drawn in order that it not bring protected expression within its scope unnecessarily, and (3) that no alternative means existed for achieving the same purpose without raising concerns under the First Amendment.
The judge rejected a "void-for-vagueness" challenge to the statute as well as claims that it violated defendants' right to due process. He found the scope and terms of the statute clear and said that defendants did not have a cognizable interest in the profits they expected to generate from the contracts. He also rejected the argument that the statute violated defendants' rights of freedom of contract since he found the statute did not result in a substantial impairment of vested rights. Finally, the judge endorsed retrospective application of the statute to accomplish the overriding public interests that prompted its enactment.

III
We first address the judge's ruling on the common-law counts. The ninth count of plaintiffs' third amended complaint demanded damages under a theory of unjust enrichment and the maxim that a "wrongdoer must not profit by his own wrongdoing." The judge dismissed this count concluding that the doctrine of unjust enrichment did not apply because plaintiffs never expected any remuneration from the publisher and the author and no direct relationship existed between the parties which would create a reasonable expectation of benefit, citing Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 109 (App.Div. 1966). We agree. In Callano we set out the conditions necessary for a party to prevail on an unjust enrichment claim. Plaintiff must prove that defendant received a *36 benefit, retention of which would be unjust. We identified a common theme in cases where liability has been successfully asserted, namely, "that the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred." Ibid. We further noted that these cases involved either a direct relationship between the parties or a mistake on the part of the person conferring the benefit.
Plaintiffs do not allege any direct relationship with defendants. Plaintiffs argue that while they did not expect remuneration from defendants, defendants have acquired a substantial amount of money by producing a book which capitalized on the publicity Kallinger received after murdering Maria Fasching. Plaintiffs contend that defendants' failure to discuss the circumstances surrounding their daughter's death with them resulted in irresponsible reporting of the facts. By this irresponsible conduct, defendants allegedly "cashed in" on plaintiffs' misfortune and were unjustly enriched at plaintiffs' expense. Plaintiffs contend that had they known defendants were publishing a book they would have expected remuneration "or more appropriately, an opportunity to object to the publication of such a book."
Summary judgment was appropriately granted under the standards of R. 4:46-2 and Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954). No genuine issue as to any material fact existed; defendants were entitled to judgment as a matter of law. No direct relationship existed between plaintiffs and defendants. Moreover, plaintiffs did not confer any benefit on defendants. Thus, even though plaintiffs assert that they would have expected payment had they known defendants were publishing The Shoemaker, this fact lacks legal significance in the absence of any benefit conferred by plaintiffs.
*37 In a related case, Collazo v. Kallinger, 11 Media L.Rep. (BNA) 1509 (Pa.Common Pleas 1985), a Pennsylvania court reached the same result when parents of another Kallinger victim claimed that Simon & Schuster was unjustly enriched by publishing an account of their son's murder in The Shoemaker. When granting Simon & Schuster's motion for summary judgment, the court in Collazo held that plaintiffs failed to state a cause of action for unjust enrichment because they had not alleged that an injustice would result by allowing Simon & Schuster to retain its proceeds from publication of the book.
Plaintiffs also contend that the author and publisher have aided Kallinger in profiting from his own wrongdoing by publishing and writing a book that reenacts the murder he committed and by paying him for telling his story. Plaintiffs say: "Since the law will not allow a wrongdoer to profit by his own wrongdoing, anyone who aids a convicted murderer in realizing this illegal goal has become a wrongdoer in his own right." In support of this claim plaintiffs cite as authority cases involving convicted murders who were the beneficiaries of their deceased victims and from whom they acquired the property of those victims by will or intestacy. See Neiman v. Hurff, 11 N.J. 55 (1952); Riggs v. Palmer, 115 N.Y. 506, 22 N.E. 188 (1889); Merrity v. Prudential Ins. Co., 110 N.J.L. 414 (E. & A. 1933); Whitney v. Lott, 134 N.J. Eq. 586 (Chan. 1944). The situation here is not analogous. The basis of common-law forfeiture is the felony conviction of the person whose property is confiscated. State v. Garcia, 114 N.J. Super. 444, 447 (Law Div. 1971). There are no cases suggesting that an author or publisher producing a book about a criminal and compensating him for his story aids the criminal in his illegal goal. Summary judgment was appropriate.
The 14th Count of plaintiffs' complaint alleged defamation of plaintiffs' decedent, Maria Fasching, by the author and the publisher. The judge dismissed this count stating

*38 Although there may be a need for a legislative solution that would permit defamation actions to be filed by representatives of decedents where the decedent is alleged to have been defamed, an action for defamation is personal. One who publishes defamatory material concerning a deceased person is not liable either to the estate of the person or to his decedents or relatives. Restatement (Second) Torts, Section 560. This Court will not legislate otherwise.
At common law, even an action for defamation brought while the plaintiff was alive did not survive death. In Canino v. New York News, Inc., 96 N.J. 189 (1984), our Supreme Court held that an action for libel or slander survives death under the Survival Act, N.J.S.A. 2A:15-3, which authorizes the personal representative to pursue claims accruing during decedent's lifetime. Accord, MacDonald v. Time, Inc. 554 F. Supp. 1053, 1057 (D.N.J. 1983). Thus, a decedent's estate may continue a defamation suit, but only for injuries to reputation occurring while the decedent was alive. Kern v. Kogan, 93 N.J. Super. 459, 472 (Law Div. 1967). Because the allegedly defamatory statements in this case were published subsequent to Maria Fasching's death, the action did not accrue during her lifetime and cannot be maintained by an administrator of her estate.
While not specified in their complaint, plaintiffs have argued before the trial court and on appeal that they possess a cause of action in their own right based on the alleged defamation of Maria Fasching. Plaintiffs rely upon Alfone v. The Newark Umbrella Frame Co., 13 N.J. Super. 526 (Co.Law Div. 1951), for the proposition that a wife may recover for the libel of her husband and reason that therefore a parent should be allowed recovery for the defamation of a deceased child. The court in Alfone, while recognizing the general rule "that no action lies by a third person for damages suffered by reason of defamation of another person," granted "equality of remedy" to the wife under the ancient common-law rule allowing a husband to recover for the libel of his wife if he himself was harmed. 13 N.J. Super. 526, 529-530 (Law Div. 1951). Alfone was implicitly overruled in Durski v. Chaneles, 175 N.J. Super. 418, 420 (App.Div.), certif. den. 85 N.J. 146 (1980), holding that summary *39 judgment should have been granted against the plaintiffs, wives of police officers, where an allegedly libelous article about the officers made no reference to the wives. We said that an "indispensable prerequisite to an action for defamation is that the defamatory statements must be of and concerning the complaining party."
Since the references to Maria Fasching in The Shoemaker were published seven years after her death, plaintiffs cannot, as representatives of the deceased, maintain a defamation action for alleged injury to her reputation. Neither may they maintain an action in their own right for statements concerning Maria Fasching alone. Summary judgment was appropriately granted to defendants on the fourteenth count of the complaint.
The sixteenth count of plaintiffs' complaint alleges "false light" invasion of privacy by the author and publisher through publication of The Shoemaker. The judge dismissed the sixteenth count concluding that plaintiffs have no right to sue for invasion of Maria Fasching's privacy with respect to The Shoemaker, published seven years after her death in 1975. Restatement, Torts 2d, § 652I at 403 (1977); Bisbee v. John Conover Agency, 186 N.J. Super. 335, 339 (App.Div. 1982). The general rule is: the right of privacy dies with the individual. Annot. "Right of Privacy  Publicity concerning deceased persons", 138 A.L.R. 51. The right of privacy is a personal right and cannot, as a general rule, be asserted by anyone other than the person whose privacy is invaded. "This principle has been held to preclude a recovery by surviving relatives for publicity concerning a deceased person." Ibid.
On appeal, plaintiffs concede that under our Survival Statute, N.J.S.A. 2A:15-3, a decedent's representative cannot maintain a cause of action for invasion of privacy of the decedent unless the alleged tort was committed during the decedent's lifetime. Canino v. New York News, 96 N.J. 189 (1984). Instead, plaintiffs urge this court "to firmly recognize a relational right *40 of privacy." They contend that New Jersey has liberalized the law of defamation and recognized a relational right of privacy in dicta in Weller v. Home News Publishing Co., 112 N.J. Super. 502, 507 (Law Div. 1970). In Weller plaintiffs argued that their privacy had been invaded by publication of their deceased mother's picture. The judge held that no such cause of action was asserted in plaintiffs' complaint. The judge did note that "[i]n any event, there is no recognized cause of action for invasion of a relational right of privacy, except in some factual circumstances when the relative is deceased at the time of the tort." citing Note, "Relational Right of Privacy," 21 Rutgers L.Rev. 74 (1966); Hanson, Libel and Related Torts, ¶ 265 at 212 (1969).
The federal district court has interpreted Weller to have rejected a relational right of privacy. Gleason v. Hustler Magazine, Inc., 7 Media L.Rep. (BNA) 2183, 2184 (D.N.J. 1981). In Gleason the widow and children of a person allegedly defamed after death argued, as plaintiffs here argue, that the court should follow a 1930 Georgia decision, Bazemore v. Savannah Hospital, 171 Ga. 157, 155 S.E. 194 (1930), which recognized a relational right of privacy. The federal court in Gleason held that a relational right to privacy was rejected in the dictum in Weller, and therefore that New Jersey courts would follow the "great weight of authority [which] adheres to the proposition that no cause of action exists where a relative, even an immediate family member, asserts that his privacy has been invaded by publication of private information about a deceased individual." 7 Med.L.Rep. (BNA) at 2185.
Gleason is in accord with the Restatement view which states "[e]xcept for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." Restatement, Torts 2d § 652I at 403 (1977). Defendants contend that New Jersey has adopted the Restatement as "the primary source of its right to privacy law," citing this court's opinion in Bisbee v. John C. Conover Agency, Inc., 186 N.J. Super. 335, 339 (App.Div. 1982). *41 In Bisbee we relied heavily on the Restatement's § 652 in addressing an invasion of privacy claim. We continue to adhere to it. Any change is for the Supreme Court to make.

IV
We now turn to the statutory claims asserted by plaintiffs under the so-called "Son of Sam" law. While noting that the intent of the Legislature was to "prevent perpetrators of sensational crimes from profiting by their criminal acts", the Law Division judge interpreted the statute as requiring the placement of all proceeds received from the sale of The Shoemaker, otherwise due the author and publisher, into an interest-bearing account for the ultimate benefit of the victim's next-of-kin. We do not agree that either the statutory language or the legislative history supports this view.
The 1983 amendment affects two categories of persons; first, persons convicted or accused of crimes or those standing in their stead, i.e., "an agent, assignee, beneficiary, conservator, executor, guardian, representative, relative, friend, associates, or conspirator" and second, "every person, firm, corporation, partnership, association or other legal entity" contracting with a person of the first category. If the contract between people of these two categories involves media reenactment of the crime or the expression of the offender's "thoughts, feelings, opinions or emotions" regarding the crime, persons of the second category are required to "submit a copy of the contract to the board" and to "pay over to the board all moneys which would otherwise, by terms of the contract, be owing the person convicted or accused of a crime." N.J.S.A. 52:4B-28. The 1983 amendment requires that anyone falling within its first category  i.e., a person accused or convicted of a crime or anyone standing in his stead  forfeit all monies owing under the terms of a contract for media reenactment of the crime or for the offender's thoughts about the crime. Neither Schreiber, nor Simon & Schuster and NAL are persons accused or convicted of *42 a crime or stand in such a person's stead. Of the defendants in this case, only the criminal, Kallinger, his wife Elizabeth Baumgarde Kallinger, and their assignee, Paul Giblin, fall within the statute's first category of persons.
Plaintiffs argue that Schreiber, Simon & Schuster and NAL are "agents" or "representatives" of Kallinger within the meaning of the statute. They contend that the author and publisher have assumed a contractual liability for providing the service of publishing a book reenacting Kallinger's crimes thus making themselves "direct agent(s) or representative(s) of Kallinger in furtherance of (his) profit-making endeavor." Defendants contend that such an interpretation distorts the well-established meaning of "agency." Defendants are not fiduciaries of the criminal; they do not act on his behalf nor are they in any way under his control. See Restatement, Agency 2d, § 1 at 7 (1958). Plaintiffs interpretation does not comport with the purpose of the statute expressed by its structure, title and legislative history, and is contrary to the well-accepted rule that "words of a statute are to be given their ordinary and well-understood meaning." Safeway Trails, Inc. v. Furman, 41 N.J. 467, 477, appeal dismissed and cert. denied 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84 (1964).
The structure and function of the 1983 amendment reinforces a construction of the statute limiting its reach to profits owed an offender. See State v. Frost, 95 N.J. Super. 1, 3-4 (App.Div. 1967) (legislative purpose revealed by composite thrust of entire statutory scheme in light of legislative history). For instance, the statute provides for the release of the escrowed monies to the accused upon acquittal, but omits any similar procedure for returning impounded funds to others. If the Legislature intended the act to reach the proceeds owed authors and publishers as well as criminal offenders, it would have also provided a mechanism to return monies to those parties upon acquittal of the offender.
*43 In New Jersey the title of a statute is not only an indication of the legislative intent but is also a limitation upon the enacting part of the law. N.J. Const. (1947) Art. IV, § VII, par. 4. A construction which would enlarge the scope of an enacting clause beyond the object expressed in the title must be rejected. St. John the Baptist Greek Catholic Church of Perth Amboy v. Gengor, 121 N.J. Eq. 349, 363 (E. & A. 1937). Here, the title  "An Act Concerning Certain Monies Received By Persons Accused of Crimes" surely suggests limiting the reach of the 1983 amendments to the proceeds owed the criminal.
The legislative history as well supports a construction limiting the statute's reach to proceeds owed one accused or convicted of a crime. In a statement accompanying the bill, the Senate Law, Public Safety and Defense Committee asserted
As amended, this bill provides a procedure whereby any person accused of a violent crime who contracts to sell his version of the reenactment of the crime by way of a movie, book, magazine article, radio or television presentation, live entertainment of any kind, or who contracts to publish his thoughts, feelings, opinions or emotions regarding the crime must turn the proceeds of such contract over to the Violent Crimes Compensation Board for the benefit of the victims of the crime. [Statement, Senate No. 434, Senate Law, Public Safety and Defense Committee (March 8, 1982)].
Similar language was adopted in the statement of the Assembly Judiciary, Law, Public Safety and Defense Committee. Confirming this intent is a media release from the Governor's office on his signing of the 1983 amendment stating, "[t]he bill is intended to prevent perpetrators of sensational crimes from profiting by their criminal actions." See Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 471-473 (App.Div. 1982). Nothing in the history suggests any intent to confiscate the proceeds of an author or publisher.
The Attorney General, intervening to defend the constitutionality of the statute, agrees with defendants that the scope of the 1983 amendment was wrongly extended by the Law Division judge to monies owed to Schreiber, Simon & Schuster and NAL. He states: "The trial court's construction of the Amendment as requiring that the profits earned by the author and *44 publisher of a literary account of a crime (as related by a criminal defendant) be forfeited to the Violent Crimes Compensation Board for distribution to victims of the crime and others, is at odds with the express language of the Amendment, its title and the legislative history thereof."
Defendants also contend that the Violent Crimes Compensation Board (not a party to this appeal) concurs with their own and the Attorney General's interpretation of the statute's scope since the Board's pending complaint in the Law Division does not demand the proceeds of either the author or publishers of The Shoemaker. While we think it difficult to assert with complete confidence the V.C.C.B.'s interpretation of the reach of the statute because they are not before us as a party, defendant's representation of the Board's position based on its complaint would appear accurate. Defendants accurately state that interpretations by the Attorney General and the administrative agency charged with the statute's enforcement are given considerable weight by a court construing a statute. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 575 (1978) (administrative agency); State v. Son, 179 N.J. Super. 549, 554-554 (App.Div. 1981) (Attorney General).
The plain language of the statute, its structure and function, its title and legislative history, as well as the interpretation accorded it by the Attorney General and the Violent Crimes Compensation Board all lead to the conclusion that the Law Division judge erred when he construed the 1983 amendment to reach the monies earned by Simon & Schuster, Schreiber and NAL. The manifest purpose of the statute was to prevent criminals from profiting from media reenactment of their crimes. The statute's forfeiture provisions do not extend to authors and publishers of such reenactments. In view of our conclusion that the statute does not apply to moneys earned by the author and the publisher, we need not consider either the plaintiffs' retroactivity contention or the defendants' constitutional claims.

*45 V
We do not reach any issue as to defendant Kallinger on the direct appeal. He never moved for summary judgment in the Law Division. Although he claims in his brief on this appeal, asserting his appellate standing, that he "joined in support of the motions filed by defendants Simon & Schuster and Schreiber which were denied by the Court," he filed no motion for summary judgment and thus suffered no adverse judgment in the Law Division. He simply is not an aggrieved party and has nothing from which to appeal. See Howard Savings Inst. v. Peep, 34 N.J. 494, 499 (1961); Malhame v. Borough of DeMarest, 174 N.J. Super. 28, 31 (App.Div. 1980). Insofar as our order granting leave to appeal and cross-appeal is construable as granting appellate status to Kallinger, that order is vacated as mistakenly granted.
The judgment on the direct appeals is reversed and summary judgment will be entered in favor of the author and publisher on the statutory claims; judgment on the cross-appeals on plaintiffs' common-law claims is affirmed. No costs.

APPENDIX A

N.J.S.A. 52:4B-26. Legislative findings and declarations

The Legislature finds and declares that every contract with a person convicted or accused of a crime in this State or an agent, assignee, beneficiary, conservator, executor, guardian, representative, relative, friend, associate or conspirator of a person convicted or accused of a crime in this State, with respect to the reenactment of the crime, by way of a movie, book, magazine article, other literary expression, recording, radio or television presentation, live entertainment or presentation of any kind, or from the expression of the person's thoughts, feelings, opinions or emotions regarding the crime is contrary to public policy and void unless the contract provides for payment of the moneys in *46 escrow to the Violent Crimes Compensation Board in accordance with the procedures set forth in this act.

N.J.S.A. 52:4B-27. Definitions

As used in this act:
a. "Victim" means any person who suffers personal injury or death or incurs loss of or injury to personal or real property as a result of the crime;
b. "Victim's representative" means one who represents or stands in the place of a victim, including but not limited to a spouse, parent, relative, guardian, dependent, heir, or executor.

N.J.S.A. 52:4B-28. Proceeds from contract regarding reenactment with person accused or convicted of crime; deposit in escrow account; civil action for damages

Every person, firm, corporation, partnership, association or other legal entity contracting with a person convicted or accused of a crime in this State or an agent, assignee, beneficiary, conservator, executor, guardian, representative, relative, friend, associate or conspirator of a person convicted or accused of a crime in this State, with respect to the reenactment of the crime, by way of a movie, book, magazine article, other literary expression, recording, radio or television presentation, live entertainment or presentation of any kind, or from the expression of the person's thoughts, feelings, opinions or emotions regarding the crime, shall submit a copy of the contract to the board and shall pay over to the board all moneys which would otherwise, by terms of the contract, be owing the person convicted or accused of a crime in this State or an agent, assignee, beneficiary, conservator, executor, guardian, representative, relative, friend, associate or conspirator of a person convicted or accused of a crime in this State. The board shall deposit these moneys in an interest bearing escrow account for the benefit of and payable to any victim of the convicted or accused person or the victim's representative, provided that the person is eventually convicted of the crime and that the victim or victim's representative brings, within five years of the date *47 of the establishment of the escrow account, a civil action for damages resulting from the crime, or has already obtained a judgment for damages resulting from the crime, or has already obtained a judgment for damages resulting from the crime, in a court of competent jurisdiction and files notice of such action with the board and recover a money judgment for damages resulting from the crime against the person or an agent, assignee, beneficiary, conservator, executor, guardian, representative, relative, friend, associate or conspirator of a person convicted or accused of a crime in this State.

N.J.S.A. 52:4B-29. Notice to victim regarding escrowed funds

The board, if the victim or victims are identifiable, shall notify these persons that such escrow moneys are available to satisfy money judgments under this act. The board, if the victim or victims are not identifiable or cannot be located, shall, at least once every six months for five years from the date it receives these moneys, cause to have published a legal notice in newspapers of general circulation in each county of the State advising that such escrow moneys are available to satisfy money judgments under this act.

N.J.S.A. 52:4B-30. Payment of money from escrow account; priorities; liens and judgments

a. If a person is not convicted of committing a crime, the board shall immediately pay over all moneys in the escrow account to the person, subject to any outstanding or pending liens or judgments. If the person is convicted, the board shall pay over the moneys according to the following priorities:
(1) Civil judgments of the victim or the victim's representative, which shall be apportioned among these judgment holders, if there is insufficient money in the account to pay each judgment in full. Any money received by the victim or the victim's representative as a result of a judgment in a prior civil action relating to the crime shall be set off against any amount due to be paid from the fund.
*48 (2) Restitution ordered by the court, pursuant to the New Jersey Code of Criminal Justice.
(3) Other judgment creditors of the accused.
(4) Reasonable costs incurred by the Violent Crimes Compensation Board in connection with the administration of the provisions of this act.
(5) The remainder of the moneys in the escrow account shall be paid to the Violent Crimes Compensation Board for use in satisfying claims filed pursuant to the "Criminal Injuries Compensation Act of 1971," P.L. 1971, c. 317 (C. 52:4B-1 et seq.). If there is a dispute as to respective priority of or the apportionment due a judgment creditor, the board shall apply to Superior Court for a declaratory judgment, with proper notice given to all parties.
b. No payment shall be made pursuant to subsection a. (5) until five years have elapsed from establishment of the escrow account or final disposition of any action brought by any victim or victim's representative pursuant to this act.
c. Moneys in the escrow account shall not be subject to execution, levy attachment or lien, except in accordance with the priority of claims established in subsection a.

N.J.S.A. 52:4B-31. Limitation of action

Notwithstanding any inconsistent provision of the civil practice law and rules with respect to the timely bringing of an action, the five year period provided for in this act shall not begin to run until an escrow account has been established.

N.J.S.A. 52:4B-32. Proceeds of escrow account used for legal fees

Notwithstanding the foregoing provisions of this act, the board shall make payments from an escrow account to a person accused of crime, upon the order of a court of competent jurisdiction, after a showing by the person that a reasonable amount of these moneys shall be used for the exclusive purpose *49 of retaining legal representation at any stage of the criminal proceedings against the person, including the appeal process.

N.J.S.A. 52:4B-33. Actions to defeat purpose of act against public policy

Any action taken by a person convicted of a crime, whether by way of execution of a power of attorney, creation of corporate entities or otherwise, to defeat the purpose of this act shall be void as against the public policy of this State.
NOTES
[1] The statute is attached as Appendix A. For discussions of the issues raised by the offender as author statutes now adopted in about 30 states see Rothman, "In Cold Type: Statutory Approaches to the Problem of Offender as Author," 71 Crim.L. and Criminology 255 (1980); Ward, "Criminals-Turned-Authors," 54 Ind.L.J. 443 (1979); Note, "Alabama's Anti-Profit Statute," 33 Ala.L.Rev. 109 (1981).