NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1408
_____

ASLAN T. SOOBZOKOV,
Tscherim Soobzokov,

Appellant

v.

ERIC LICHTBLAU; HOUGHTON, MIFFLIN AND HARCOURT;
JOHN DOE; JANE DOE; ABC CORPORATIONS
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-15-cv-06831)
District Judge: Honorable Susan D. Wigenton
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 3, 2016

Before: CHAGARES, HARDIMAN, and SCIRICA, *Circuit Judges*.

(Filed: November 4, 2016)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

HARDIMAN, *Circuit Judge*.

Aslan Soobzokov appeals an order of the District Court dismissing his claims against publisher Houghton Mifflin Harcourt and author Eric Lichtblau. We will affirm.

I

In 2014, Houghton Mifflin published Lichtblau's book, *The Nazis Next Door: How America Became a Safe Haven for Hitler's Men*. In that work, Lichtblau argues that the United States government brought Nazis here after World War II for strategic purposes. Among these alleged Nazis was Soobzokov's father, Tscherim. According to Lichtblau, Tscherim agreed to provide intelligence on the Soviet Union in exchange for clemency and residency in the United States.

*The Nazis Next Door* also describes the challenges faced by the children of accused Nazis. In researching this aspect of his book, Lichtblau spent "nearly seven full days" with Soobzokov and later communicated with him by email and telephone. App. 151. Soobzokov makes a handful of appearances in the book—all of which emphasize his unwavering belief in his father's innocence.

After the book's publication, Soobzokov sued Lichtblau and Houghton Mifflin for defamation, invasion of privacy, and intentional infliction of emotional distress. The District Court dismissed Soobzokov's suit under Federal Rule of Procedure Rule 12(b)(6) for failure to state a claim. Soobzokov now appeals.

We review the District Court's order de novo. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

Soobzokov argues that the references to him in *Nazis Next Door* are defamatory. A defamatory statement is "false and injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence in which he or she is held by others." *Romaine v. Kallinger*, 537 A.2d 284, 287 (N.J. 1988) (internal citations omitted). In making this determination, "the court must evaluate the criticized language according to the fair and natural meaning which it would be given by persons of ordinary intelligence." *Decker v. Princeton Packet, Inc.*, 561 A.2d 1122, 1125 (N.J. 1989) (internal citations omitted).

At the outset, we must distinguish Soobzokov's legal claims from his general grievances about the book. Soobzokov does not—and could not—assert a defamation claim on behalf of his deceased father.[2] Rather, Soobzokov makes two claims in his own

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

[2] Given Soobzokov's continuing belief in his father's innocence, we understand how his arguments could be read as being brought on behalf of Tscherim. *See, e.g.*, App. 151 (alleging that "Lichtblau had written a horrendous defamatory book that was devoid of truth and was clearly written to destroy Tscherim's reputation"); Soobzokov Br. 5 ("Lichtblau falsely and brutally accused Tscherim of being a Nazi War Criminal during World War II."). But Soobzokov properly disclaims that theory, Soobzokov Resp. 2, and,

right: (1) that the descriptions of him are defamatory; and (2) that the descriptions of him, in combination with the negative comments about his father, are defamatory.

A

Soobzokov claims that three references to him are defamatory under New Jersey law. We agree with the District Court that these references do not constitute defamation.[3]

The first references to Soobzokov appear in a chapter entitled "The Sins of the Father," which chronicles the experiences of the "sons and daughters of accused Nazis." Supp. App. 153. In that chapter, Lichtblau notes that Soobzokov believed "fervently in his own father's innocence" and that Soobzokov's "years-long defense of his father became an obsession." Supp. App. 155. For example, the book explains that when rumors of Tscherim's Nazi affiliations swirled at Soobzokov's high school, Soobzokov "felt as if everyone's eyes were on him . . . , [the] 'son of the Nazi.'" Supp. App. 155–56. Lichtblau also describes how Soobzokov would "angrily" confront protestors in front of his family home. Supp. App. 156. Finally, Lichtblau recounts Soobzokov's "solitary trek to avenge his father's honor": an episode where Soobzokov drove four hours to a book signing and confronted an author who had accused Tscherim of war crimes. *Id.*

---

regardless, any such claim is not actionable. *See Fasching v. Kallinger*, 510 A.2d 694, 701 (N.J. Super. Ct. App. Div. 1986) ("Because the allegedly defamatory statements in this case were published subsequent to [the subject's] death, the action did not accrue during her lifetime and cannot be maintained by an administrator of her estate.").

[3] On appeal, Soobzokov now challenges certain excerpts that were not cited in his complaint. Because we "will not consider issues raised for the first time on appeal," those arguments are forfeited. *See Delaware Nation v. Pennsylvania*, 446 F.3d 410, 416 (3d Cir. 2006).

While Soobzokov admits that these incidents took place, he argues that the passages make him appear "bizarre, obsessive, and mentally unstable." Soobzokov Br. 17. But as the District Court explained, nothing therein "is injurious to [Soobzokov's] reputation or would subject him to ridicule, contempt or hatred." App. 7; *see also O'Brien v. Lerman,* 498 N.Y.S.2d 395, 396 (N.Y. App. 1986) ("The words 'went crazy' . . . indicating plaintiff's extremely angry reaction, cannot reasonably be understood by the mind of the ordinary intelligent reader as imputing to plaintiff insanity or mental instability."). Rather, these excerpts show "an understandable pattern of behavior seen in first-generation children of accused Nazis who believe in their fathers and their innocence." App. 7 (opinion of District Court, citations and alterations omitted).

Second, Lichtblau describes Soobzokov's determination to revive the investigation into his father's brutal murder—which had gone unsolved for nearly 25 years. Specifically, Lichtblau wrote that Soobzokov "pressed authorities to reopen the investigation" and alleged that "prosecutors failed to bring charges against [the suspected Jewish militants] because of his father's notoriety as a Nazi." Supp. App. 253–54.

The District Court explained that "rather than defaming [Soobzokov], this section evidences a son's devotion to his father and desire to obtain answers about his murder." App. 8. We agree. Soobzokov argues that the passage implies that he called Tscherim a Nazi while relaying the story to Lichtblau. While such an interpretation is theoretically possible, it is not the natural interpretation of the passage—particularly considering the book's repeated references to Soobzokov's firm belief in his father's innocence. *See*

5

*Decker*, 561 A.2d at 1125 (explaining that the "allegedly defamatory statement must be taken in context and the publication considered as a whole").

Third, Soobzokov is listed in the "Acknowledgments" section of the book. Supp. App. 258. Lichtblau writes that he is "grateful" to Soobzokov and two other children of accused Nazis "for their cooperation." *Id.*

Soobzokov argues that any implication that he assisted Lichtblau's book "lends Soobzokov to be considered as a traitor to his father before the entire world." Soobzokov Br. 51. But we agree with the District Court that Lichtblau's brief and benign acknowledgement cannot fairly be read to carry such an extreme reading. And because Soobzokov was interviewed by Lichtblau for an entire week and provided volumes of documents, App. 151, the District Court did not err when it concluded that "[Soobzokov] did cooperate with Lichtblau." App. 8. Given the truth of that conclusion, the acknowledgment cannot be defamatory. *Ditzel v. Univ. of Med. & Dentistry of N.J.*, 962 F. Supp. 595, 605 (D.N.J. 1997) ("[T]ruth is an absolute defense to defamation.").

B

We next consider Soobzokov's claim that the aforementioned references, in combination with Lichtblau's description of Tscherim as a Nazi war criminal, are defamatory.[4] Though Houghton Mifflin and Lichtblau portray this argument as an "effort

---

[4] *See, e.g.*, Soobzokov Br. 3 ("The defendants wrote a book where they called the plaintiff . . . the son of a Nazi war criminal."); *id.* at 42–43 ("[P]eople will believe that Soobzokov is the son of a Nazi war criminal. One could assume that Soobzokov had Nazi sympathies.").

to circumvent th[e] well-established rule barring surviving relatives from bringing libel claims relating to statements about the dead," Resp. Br. 19**,** we understand Soobzokov's distinction. It's one thing to call a deceased person a Nazi; it's a very different thing to call a living person the child of a Nazi. Assuming *arguendo* the falsity of Lichtblau's book, we now consider whether falsely labeling someone the son of a Nazi states a claim under New Jersey law.

Because the New Jersey Supreme Court has not decided whether an individual can be defamed by being linked to an infamous relative, we must predict how it would decide that question. *See McGowan v. Univ. of Scranton*, 759 F.2d 287, 291 (3d Cir. 1985). Other states are split on the issue. *Compare Van Wiginton v. Pulitzer Pub. Co.*, 218 F. 795, 797 (8th Cir. 1914) ("The social standing of a young woman may be affected to an appreciable degree by the evil repute of her parents. At any rate, it cannot be said as matter of law that she suffers no injury."), *and Merrill v. Post Pub. Co.*, 83 N.E. 419, 422 (Mass. 1908) ("To write of a man that he is the brother of a sister arrested for larceny might well be thought by a jury to impair his standing in the community." (internal quotations omitted)), *with Sarwer v. Conde Nast Publ'ns, Inc*., 237 A.D.2d 191, 191 (N.Y. App. 1997) (denying a defamation claim based on an article describing plaintiff's abuse at the hand of her father because "New York does not recognize the tort of libel by relation"), *and Ritzmann v. Weekly World News, Inc*., 614 F. Supp. 1336, 1339 (N.D. Tex. 1985) (explaining that although plaintiff was described as the wife of a criminal, "a

7

marital relation to the alleged perpetrator does not extend a cause of action for libel to her").

The most relevant precedent is the New Jersey Supreme Court's decision in *Romaine v. Kallinger*, 537 A.2d 284 (N.J. 1988), where the court rejected an analogous theory of defamation by association. At issue was a book passage that loosely linked the two plaintiffs with "a junkie they both knew who was doing time in prison." *Id*. at 288–89. The court explained that "only the most contorted reading of the offending language could lead to the conclusion that it accuses plaintiff of illegal drug use or criminal associations" and that "absent exceptional circumstances, the mere allegation that plaintiff knows a criminal is not defamatory as a matter of law." *Id.* at 292. Moreover, the context of the statement showed that plaintiffs' "interest in the 'junkie' stemmed from sympathy and compassion, not from any predilection toward or involvement in criminal drug activity." *Id.* at 292–93. In reaching its decision, the New Jersey Supreme Court cited approvingly to a federal case applying New York law and holding that the "mere imputation of [a] family relationship with [a] Mafia leader" was not defamatory, but the "characterization of plaintiff as a political contributor with alleged mob ties" could be defamatory. *Id.* at 292 (citing *Bufalino v. Associated Press*, 692 F.2d 266 (2d Cir. 1982), *cert. denied*, 462 U.S. 1111 (1983)).

Given the reasoning in *Romaine*, we predict that the New Jersey Supreme Court would reject Soobzokov's claim. New Jersey requires that the offending statement do more than merely associate the plaintiff with a disreputable *individual*; it must indicate

8

that the plaintiff participated in disreputable *behavior*. *See Romaine*, 537 A.2d at 292

(rejecting the defamation claim because the offending passage did "not suggest either

direct or indirect involvement" by the plaintiffs in the illegal behavior). Here, Lichtblau

does not insinuate that Soobzokov was involved in Nazi activities. And like the plaintiffs

in *Romaine*, Soobzokov's devotion to his father "stemmed from sympathy and

compassion" and not from "predilections toward or involvement in" Nazi causes. *See id.*

at 292–93. Finally, the *Romaine* court's citation to *Bufalino*—that "mere imputation of

family relationship" without more cannot be defamatory—supports our decision. *See id.*

at 292.

C

Even if *The Nazis Next Door* were defamatory under New Jersey law,

Soobzokov's claim would still fail because the book dealt with a matter of public concern

and the complaint does not allege actual malice. *See, e.g.*, *Durando v. Nutley Sun*, 37

A.3d 449, 457 (N.J. 2012). Tacitly admitting that he failed to plead actual malice,

Soobzokov argues that his claims do not implicate a matter of public concern. We

disagree.

"Speech deals with matters of public concern when it can be fairly considered as

relating to any matter of political, social, or other concern to the community, or when it is

a subject of legitimate news interest; that is, a subject of general interest and of value and

concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted).

"Discourse on political subjects and critiques of the government will always fall within

9

the category of protected speech that implicates the actual-malice standard." *Senna v. Florimont*, 958 A.2d 427, 444 (N.J. 2008).

*The Nazis Next Door* implicates matters of public concern. The book—which uncovers controversial matters of international relations and geopolitics following a world war—clearly relates to a "political subject." *See Florimont*, 958 A.2d at 444. Moreover, Lichtblau offers a structural and moral "critique[] of the government." *See id.*; *see also, e.g.*, Supp. App. 27 (explaining that Nazis received "help from the American government coming in the form of an inept immigration system that made it easy for them to bury their pasts"); *id.* at 26 ("The fact that a number of [Nazi immigrants] had built rockets on the backs of slave laborers at concentration camps, or performed hideous medical experiments on concentration camp prisoners, was of little concern [to the United States government].").

Moreover, Soobzokov cannot separate his individual story from this broader narrative. Almost any historical account will include details of individuals. If each person could object to the inclusion of his own story, then important speech could be stifled. Such a rule would "threat[en] the free and robust debate of public issues" and "interfere[] with a meaningful dialogue of ideas." *Snyder*, 562 U.S. at 452 (quotations omitted). For that reason, the Supreme Court has recognized that even if the speech "contain[s] messages related to [a named private citizen] specifically, that would not change the fact that the overall thrust and dominant theme of [the speech] spoke to broader public issues." *Snyder*, 562 U.S. at 454.

10

## III

Our decision regarding Soobzokov's defamation claim dooms his causes of action for false light and intentional infliction of emotional distress. *See G.D. v. Kenny*, 15 A.3d 300, 318-19 (N.J. 2011) (explaining that a plaintiff cannot claim false light or intentional infliction of emotional distress based on speech that is not defamatory). This is doubly true when the offending speech addresses a matter of public concern, as New Jersey extends the same constitutional protection to false light and emotional distress claims as it does to defamation claims. *Durando*, 37 A.3d at 458 ("[A] false-light claim parallels the requirements of the actual-malice standard in First Amendment jurisprudence and our own common law."); *Decker*, 561 A.2d at 1129 ("[T]he [F]irst [A]mendment requires that plaintiff establish at least the same level of intent to recover for the infliction of emotional harm as is necessary to find defamation.").

Because we have already found that the cited passages do not constitute defamation and deserve constitutional protection, Soobzokov's false light and emotional distress claims also fail.

\*　　\*　　\*

For the reasons stated, we will affirm the District Court's judgment.