Harry Herbert DITZEL, III, Plaintiff,

v.

UNIVERSITY OF MEDICINE AND DEN-
TISTRY OF NEW JERSEY, Stanley S.
Bergen, Jr., Barbara Vanderkolk, John
Does(s), individually and in their official
capacities, Defendants.

Civil Action No. 94–4918(WHW).

United States District Court,
D. New Jersey.

April 14, 1997.

Martin W. Aron, Richard M. DeAgazio, William P. Cunningham, Jeffrey P. Gardner, Budd Lamer Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, for Defendant Barbara Vanderkolk.

Peter Verniero, Attorney General of New Jersey, Michael J. Gonnella, Deputy Attorney General, New Jersey Department of Law and Public Safety, Division of Law, Newark, for Defendants University of Medicine and Dentistry of New Jersey and Stanley S. Bergen, Jr.

## OPINION

WALLS, District Judge.

On January 31, 1994, plaintiff Harry Herbert Ditzel was fired from his position as Manager of Publications at the University of Medicine and Dentistry ("UMDNJ"). Ditzel, who is a white male and survivor of childhood cancer, alleges that he was harassed and discharged because of his medical condition

and race. Defendants, however, contend that Ditzel was fired for poor performance and not for any discriminatory reason. Defendants have moved for summary judgment seeking dismissal of the complaint as a matter of law. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court determines these motions without oral argument and as unopposed because plaintiff's counsel failed to submit timely opposition papers.

## BACKGROUND

Ditzel began working for UMDNJ in 1982 as a writer/editor in its Department of Government and Public Affairs ("GPA") and in 1988, he became a Manager of Publications within that department. As Manager of Publications, he reported directly to Carol Pilla, Director of University Communications. Pilla, in turn, reported to the Vice-President of the Government and Public Affairs. In September 1992, defendant Barbara Vanderkolk became Vice-President of Government and Public Affairs. At all times relevant to this dispute, defendant Stanley S. Bergen, Jr. ("Bergen") was President of UMDNJ.

In the Fall of 1993, Vanderkolk gave Pilla and Ditzel primary responsibility for preparing UMDNJ's 1993 Annual Report ("Annual Report"). The Annual Report was first distributed during UMDNJ's "University Day" festivities on January 27, 1994. After they were distributed, defendants discovered that the document contained several errors: the law firm of the then-chair of the UMDNJ Board of Trustees was misidentified, information on racial background of UMDNJ staff had not been updated and certain health care centers affiliated with UMDNJ were omitted or misidentified. Of particular concern to Bergen and Vanderkolk, however, was that the identity of Dr. Albert Talone, a member of UMDNJ's Board of Trustees, and his photograph, were missing from the 300 copies that had been distributed before the error was discovered.

On January 31, 1994, Vanderkolk sent both Pilla and Ditzel letters notifying them that they had been terminated. In her letter to Ditzel, Vanderkolk indicated that he had been terminated because of unsatisfactory work performance and failure to follow his supervisor's instructions and specifically noted "recent serious errors on the Annual Report and the directional pamphlets." (UMDNJ & Bergen Ex.D). After Ditzel and Pilla were terminated, their positions were consolidated and this new position was filled by Barbara Hurley, a white woman.

In the February 2, 1994 issue of the UMDNJ newsletter "Health Extra," Vanderkolk published a statement entitled "A Message to the University Community," apologizing for the Annual Report. The entire statement reads:

> Please accept my sincere apologies for several errors that appeared in the copies of the Annual Report that were distributed at last week's State of the University event. If you are in possession of one of these copies, please return it to our office and we will get you a corrected copy promptly. Those of us in Government and Public Affairs pride ourselves on our commitment to excellence in our work. Appropriate actions have been taken regarding those individuals responsible for this serious breach of quality. A corrected version of the Annual Report is being printed, and quantities of it will be available to those of you who need it for recruiting and other external and internal relations activities.

(UMDNJ & Bergen, Exhibit F).

In this action, Ditzel claims that defendants unlawfully harassed and discharged him because of his race and medical condition and in retaliation for having criticized Vanderkolk's use of the term "white boys" and that Bergen and Vanderkolk unlawfully conspired against him to accomplish this purpose. Although he acknowledges that the Annual Report contained errors and that he was at least partially responsible for them, he asserts that they were not serious enough to warrant his termination and thus, were merely a pretext for unlawful discrimination. He also alleges that Vanderkolk's "Message to the University Family" defamed him and breached UMDNJ's agreement to maintain the confidentiality of his employment record. His Amended Complaint alleges violations of the New Jersey Law Against Discrimination

("NJLAD") and the Americans with Disabilities Act ("ADA"), breach of employment contract, defamation, federal and state constitutional claims and common law tort claims.

Plaintiff is a survivor of Wilms' Tumor, an extremely rare form of childhood kidney cancer. As the result of massive doses of radiation he received as a child, he has suffered internal and external radiation burns, physical disfigurement and loss of his left kidney, appendix, half of his stomach and much of his intestines. Ditzel claims that soon after Vanderkolk was hired in September 1992, he asked to speak with her privately. and told her that he was a survivor of childhood cancer and that he had been recently hospitalized due to the secondary effects of his radiation treatments. He also assured her that he never let his medical condition or treatment impact his work.

According to plaintiff, soon after he disclosed his medical condition to her, Vanderkolk began to treat him unfairly. In his words, she became "very cool—or cruel" towards him. (Vanderkolk, Ex. A, Ditzel Dep. at 63). He also claims that Vanderkolk, who is white, discriminated against him because he is a white male. Specifically, he alleges that on various occasions, Vanderkolk used the term "white boys" as a pejorative description in his presence. Plaintiff, however, is only able to recall one specific incident when she used that term. He alleges that at a senior staff meeting in March 1993 during a discussion about possible nominees to the UMDNJ Board of Trustees, all of whom were white men, she turned to him and said "just what we need, another white boy." (Vanderkolk, Ex. A, Ditzel Dep. at 156). On May 28, 1993, in response to Vanderkolk's request for staff feedback in preparation for an upcoming staff retreat, plaintiff wrote to Vanderkolk expressing his concern over her use of the term "white boys." He wrote that "as someone who happens to be a white man, I've taken offense to and have been hurt by your derogatory use of the term 'white boys' on various occasions" because "[i]t makes me feel like a target because of who I am by birth." (Bergen & UMDNJ Ex. G, at 2). His retaliation claim is apparently based on the belief that Vanderkolk terminated him because he criticized her use of the term "white boys."

He also claims that Vanderkolk's unfair treatment of him includes a derogatory comment she made to him after the *Star Ledger* ran an article about efforts to airlift medical supplies to aid sick children in former Yugoslavia organized by plaintiff, Congressman Bob Franks and several pharmaceutical companies. He claims that she "coldly" said to him "Oh, are Congressman Franks' constituents Serbian?" (Vanderkolk Ex.A, Ditzel Dep., at 157).

As further proof of defendants' discriminatory animus, plaintiff claims that Vanderkolk's derogatory statements were "punctuated" by the posting of certain magazine articles addressing diversity in the workplace on a department bulletin board located near his office because their headlines were offensive to white men. The first, an article from the *National Business Employment Weekly*, had the headline *"Termination Trends: Mass Layoffs Tend to Spare Women, Minorities"* and the next line read *"Last Hired— First Fired Rules Disappear. More Older White Men Receive Pink Slips."* The other article that he deemed particularly offensive was entitled *"The Demonizing of White Men"* from the *U.S. News and World Report*. Although Plaintiff never bothered to read these articles, he believes that they were offensive to white men and that the *U.S. News and World Report* article stated that "white men are demons." (Vanderkolk, Ex. A., Ditzel Dep. at 165). He also suggests that UMDNJ's "Workforce 2000" program aimed at increasing diversity in the UMDNJ workforce and Vanderkolk's active support of the program are further evidence of the discriminatory animus which led to his firing on January 31, 1994.

Plaintiff admits that he did not have a written employment contract with UMDNJ. Nonetheless, he claims to have had a general understanding, based on memoranda, favorable employment evaluations and job descriptions, that if he performed his work satisfactorily he would not be terminated. He acknowledges, however, that he received nothing in writing from UMDNJ confirming this presumption and admits that he read the

UMDNJ Staff Handbook which defined his employment as "at will." Plaintiff also claims that Vanderkolk's "Message to the University Family" was false and that she published it to injure his reputation. He claims that her statement injured his reputation and caused him great pain and mental anguish.

Defendants have now brought separate summary judgment motions seeking to dismiss the Amended Complaint as a matter of law. For convenience and in view of the similarity of their arguments, the Court refers to them collectively as defendants' motions. In their papers, defendants contend that Ditzel was terminated as the result of his own professional incompetence, as evidenced by the Annual Report debacle, and not for any discriminatory reason. According to defendants, soon after the Annual Report was distributed, Bergen sent a personal apology to Talone apologizing for his unfortunate omission and promising him that "[a]ctions will be taken." (Bergen & UMDNJ, Ex. B). They further allege that Bergen conveyed his displeasure to Vanderkolk and told her that he wanted the people responsible for the errors fired. They note that on January 28,1994, Pilla, with Ditzel's knowledge, sent a memorandum to Vanderkolk acknowledging the serious mistakes made in the Annual Report, admitting fault and apologizing. (Bergen & UMDNJ, Ex. C). In the memorandum, Pilla even suggested that she and Ditzel would be willing "to send a letter of apology to Dr. Talone." (Id.) Vanderkolk claims that in addition to being extremely embarrassing, correcting the errors cost UMDNJ $25,000 over the $35,000 originally budgeted for the Annual Report. Furthermore, as she alluded to in Ditzel's termination letter, Vanderkolk claims that his poor performance predated the Annual Report debacle and cites his failure to adequately develop a style book for UMDNJ's publications, inferior work on a project involving directional maps and brochures, and history of proofreading errors.

As for plaintiff's purported evidence of discrimination, defendants claim that it cannot support any credible claim of unlawful discrimination. Vanderkolk denies that she discriminated against plaintiff on the basis of his race or medical condition. She notes that she accommodated his medical condition by frequently excusing him during staff meetings so that he could use the bathroom, the need to use the bathroom frequently being a side effect of his medical condition. Ditzel, in fact, concedes that Vanderkolk did accommodate him in this manner and never indicated that it was a problem. (See Vanderkolk, Ex. A, Ditzel Dep. at 58). While Vanderkolk admits that she made the "white boys" comment at the staff meeting, she claims that she was only making a sarcastic observation of the "attitudes of corporate America," ostensibly the practice of appointing white males instead of women and minorities to prominent positions and notes that her comment was obviously not directed at Ditzel. Moreover, she claims that immediately after Ditzel complained in writing about her use of the term "white boys," she publicly announced at the staff retreat that she would never use the term "white boys" again as shorthand for the "old guard" way of conducting business. In fact, Ditzel concedes that, after he complained, Vanderkolk never used the term "white boys" again in his presence.

Vanderkolk, however, denies that she ever made the alleged comment about Congressman Franks, and asserts that even if she did, it was simply a sarcastic comment about a politician and not a statement directed at Ditzel because of his medical condition. Defendants further argue that Vanderkolk's "Message to the University Family" was not defamatory and did not breach any agreement to protect the confidentiality of his employment record because the statement was truthful and did not identify plaintiff by name or indicate what specific actions were taken against him. Finally, defendants argue that because it was well-established that plaintiff was an at-will employee, his termination did not breach an implied employment contract.

## DISCUSSION

A. *Summary Judgment Standard*

Summary judgment is appropriate where the moving party establishes that there is no

genuine issue of material fact and that it is entitled to a "judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant must show that if the evidence submitted were reduced to evidence admissible in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather it is to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–2511, 91 L.Ed.2d 202 (1986). In making this determination, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Id.*

### B. *Claim Under the Americans with Disabilities Act*

■ In Count One of his Amended Complaint, plaintiff alleges discriminatory harassment and discharge in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § § 12101 *et seq.* (1995) ("ADA"). Parties seeking to file employment discrimination claims under § 12117(a) of the ADA must follow the administrative procedures set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e) ("Title VII"). See 42 U.S.C. § 12117; *Bishop v. Okidata, Inc.*, 864 F.Supp. 416, 424 (D.N.J.1994). Title VII requires an aggrieved party to file, within 180 days of the alleged discriminatory practice, a charge with the EEOC and receive a "right to sue" letter before bringing an action against "the respondent named in charge." 42 U.S.C. § 2000e–5.

Here, plaintiff did not plead in his complaint that he filed a prior complaint with the EEOC or the New Jersey Division of Civil Rights. In his deposition, plaintiff conceded that he never filed an administrative complaint with either agency. (See Vanderkolk Ex. A, Ditzel Dep. at 41). Consequently, plaintiff's ADA claim is barred because he has failed to exhaust his administrative remedies. Therefore, the Court dismisses Count One of the Amended Complaint as a matter of law.

### C. *Unlawful Discrimination*

Plaintiff alleges that defendants intentionally discriminated against him by harassing and discharging him on the basis of his disability and status as a white male under the NJLAD. Unlike the ADA or Title VII, the NJLAD does not require that a party file an administrative complaint with the New Jersey Division of Civil Rights or the EEOC before filing suit. Therefore, plaintiff's NJLAD claims are ripe for decision.

■ The New Jersey Supreme Court has held that an employment discrimination claim under the NJLAD is analyzed under the familiar burden shifting method of proof first outlined by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See, e.g., Erickson v. Marsh and McLennan Co.*, 117 N.J. 539, 549–550, 569 A.2d 793 (1990); *Peper v. Princeton University Board of Trustees*, 77 N.J. 55, 81–83, 389 A.2d 465 (1978). Under this analysis, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of employment discrimination. To establish a prima facie case of discriminatory discharge, the plaintiff must prove: (1) that he or she is a member of a protected group; (2) that he or she was performing his job at a level that met his employer's legitimate expectations; (3) that he or she was nevertheless fired; and (4) that the employer sought someone to perform the same work after he or she left. *See, e.g., Erickson*, 117 N.J. at 550–551, 569 A.2d 793; *Clowes v. Terminix International*

*Inc.*, 109 N.J. 575, 597, 538 A.2d 794 (1988). As required, this standard analysis is modified to accommodate the range of discriminatory conduct prohibited in promotion, discharge, compensation and other conditions of employment.

Plaintiff's successful demonstration of a prima facie case raises a rebuttable presumption of unlawful discrimination. *Id.* The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for the its actions. If the employer satisfies this burden, the presumption of discrimination is rebutted. The plaintiff must then prove, by a preponderance of the evidence, that the defendant's proffered reason was not the true motivating reason, but was merely a "pretext for discrimination." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515–517, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993); *Clowes,* 109 N.J. at 596, 538 A.2d 794.

By asserting that his medical condition was a controlling factor in his discharge, plaintiff alleges that defendants violated Section 10:5–4.1 of the NJLAD. Section 10:5–4.1 prohibits discrimination and unlawful employment practices against any person on the grounds that such person is, or has been at any time, handicapped unless the nature and extent of the handicap reasonably precludes the performance of particular job function.

Plaintiff's reverse race discrimination claim falls under section 10:5–12(a) of the NJLAD, which forbids an employer from discriminating against an employee on the basis of race or gender.[1] To establish a prima facie case of reverse discrimination under the NJLAD, the New Jersey Supreme Court held in *Erickson* that in addition to satisfying the same analysis routinely applied to typical discharge cases, the unique nature of reverse discrimination claims compelled the Court to modify the first prong by requiring that the employee demonstrate that "he has been victimized by an 'unusual employer who discriminates against the majority.'" *Erickson,* 117 N.J. at 551, 569 A.2d 793 (quoting *Livingston v. Roadway Express,* 802 F.2d

1250, 1252 (10th Cir.1986)). The court modified the analysis, recognizing that the rationale underlying the first prong—that the plaintiff be a member of a protected class—does not apply in reverse discrimination cases because it derives from the NJLAD's federal counterpart, Title VII, which "'reflects congressional efforts to address the nation's history of discrimination against racial minorities, a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effects.'" *Id.* at 551, 569 A.2d 793 (quoting *Murray v. Thistledown Racing Club Inc.,* 770 F.2d 63, 67 (6th Cir.1985)). It reasoned that "when a complainant is a member of the majority and not representative of persons usually discriminated against in the workplace, discrimination against that person is unusual." *Id.* at 552, 569 A.2d 793.

In addition to traditional intentional discrimination claims, plaintiff also appears to raise a hostile work environment harassment claim. To sustain a hostile work environment claim, a plaintiff must establish that the complained of conduct would not have occurred but for the employee's handicap, race or gender and that it was severe and pervasive enough to make a reasonable person in the employee's shoes believe that the conditions of employment had been altered and the working environment had become hostile and abusive. *See Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 603–604, 626 A.2d 445 (1993).

To defeat a summary judgment motion in an employment discrimination case, the plaintiff must submit evidence from which a factfinder could reasonably either (1) disbelieve defendant's articulated legitimate reasons, by demonstrating such weaknesses, inconsistencies or contradictions in those reasons that the jury could rationally find them "unworthy of credence;" or (2) believe that a discriminatory reason was more likely than not a motivating cause of the employer's action, such as by showing that the employer treated other similarly situated employees

---

1. In Count Seven, Plaintiff also alleges a violation under 42 U.S.C. § 1981. Because this presumably is a reverse race discrimination claim, the Court's analysis of plaintiff's reverse discrimination claim under the NJLAD will also apply to his § 1981 claim.

more favorably. *See Sheridan v. E.I. DuPont de Nemours and Company,* 100 F.3d 1061, 1067–1068 (3d Cir.1996) (*en banc*); *Fuentes v. Perskie,* 32 F.3d 759, 765, (3d Cir.1994); *Romano v. Brown & Williamson Tobacco,* 284 N.J.Super. 543, 551, 665 A.2d 1139, 1143 (App.Div.1995). The plaintiff, however, need only raise a genuine issue of fact with regard to the employer's actual motive. *Romano,* 284 N.J.Super. at 551, 665 A.2d at 1143.

The Court will address plaintiff's claims of handicap discrimination and reverse race discrimination separately.

■ Here, this Court finds that plaintiff's case is so lacking in evidentiary strength that it borders dangerously on the frivolous. He has presented no credible evidence that his discharge was in any way discriminatory or that he was harassed while on the job. First, plaintiff has failed to establish a prima facie case of intentional discrimination on the basis of his medical condition because he has not demonstrated that he was performing his job at a level that met his employer's legitimate expectations. The errors contained in the Annual Report alone clearly indicate that his performance was inadequate. Plaintiff does not deny that these errors were made or dispute that he was at least partially responsible for them.

■ Even assuming that plaintiff established a prima facie case of discrimination, he cannot survive summary judgment because he has neither shown that defendants proffered legitimate nondiscriminatory reason for his discharge—his poor performance—is "unworthy of credence" or that his discharge was motivated by discriminatory animus. To discredit an employer's proffered reason of poor performance, plaintiff cannot simply show that the employer's decision was "wrong or mistaken" but instead must show that it was motivated by discriminatory animus. *Fuentes,* 32 F.3d at 765. Courts are not permitted to second-guess performance standards or "to make personnel decisions for employers." *Peper,* 77 N.J. at 87, 389 A.2d 465. *See Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096–1097. Although plaintiff argues that the errors in the Annual Report were not significant enough to justify his termination, the Court is satisfied that his termination was not pretextual. Unquestionably, these errors were extremely embarrassing and costly to UMDNJ. Bergen, incensed over the incident, gave Vanderkolk a clear directive to fire those responsible for the errors. Moreover, Pilla's termination for the same errors undermines any argument by plaintiff that defendants' claim of poor performance was simply pretext for unlawful discrimination.

Plaintiff's purported proof that his termination was motivated by handicap discrimination consists of Vanderkolk's reference to the proposed UMDNJ Board of Trustees as "white boys," her comment about Congressman Franks' constituency and his vague perception that Vanderkolk became cool towards him once he disclosed his medical condition to her. None of this evidence suggests the presence of discriminatory animus against plaintiff because of his medical condition. In fact, plaintiff has never claimed that Vanderkolk or anyone else made any comments about his medical condition. Indeed, if plaintiff is to be believed, Vanderkolk granted the only accommodation he required for his medical condition, to be excused frequently from staff meetings so that he could use the bathroom. Thus, the Court finds that plaintiff has not presented any credible evidence that he was harassed and discharged because of his medical condition.

■ The Court also finds that plaintiff has failed to produce even a shred of evidence in support of his reverse race discrimination claim. At the outset, this Court admits that it is skeptical that plaintiff, a white male, can establish that he suffered reverse race discrimination at the hands of his white supervisor. However, notwithstanding the Court's marked doubts, objectively, plaintiff has failed to establish a prima facie case of reverse race discrimination. Not only has he failed to show that he was performing at a level that met his employer's legitimate expectations but he has also failed to show that UMDNJ is the unusual employer that discriminates against the majority. There is absolutely no evidence that UMDNJ engages in a pattern of favoring minority employees.

It is also undisputed that a white woman replaced plaintiff and Pilla after their jobs were consolidated.

▮▮▮ Vanderkolk's comment at the meeting was a comment about the selection process for UMDNJ trustees and ostensibly her feelings that women and minorities should also have been proposed as candidates. Her use of the term "white boys" was pure sarcasm and at worst, may reflect poor judgment about when flippant language is appropriate but it certainly does not buttress plaintiff's claim of racially discriminatory harassment and discharge. In support of his claim of reverse racial discrimination, plaintiff also relies on the two articles addressing issues of racial diversity on the workforce posted outside his office and Vanderkolk's support of Workforce 2000, UMDNJ's equal opportunity employment program, as further evidence of discriminatory animus. If plaintiff had bothered to read the articles he would have realized that they were innocuous informational material and not hostile or discriminatory. In fact, the *U.S. News & World Report* article, *"The Demonization of White Men"*, which he thought stated that white men were evil, is actually a sympathetic article which suggests that white men may be adversely impacted by increasing diversity in the workplace. Indeed, if the Court were to adopt plaintiff's paranoid worldview, no discussion regarding the need to provide equal opportunities for women and minorities in the workplace could occur for fear that white males would feel unlawfully harassed by such efforts. Similarly, the fact that UMDNJ has an equal employment opportunity program and that Vanderkolk supported its goals of achieving broader representation of minorities and women at UMDNJ is not evidence of discriminatory animus.

Accordingly, because plaintiff has proffered no evidence showing that he was discriminated against on the basis of his medical condition or race, the Court dismisses Counts Five and Six of the Amended Complaint.

D. *Defamation Claims*

▮▮▮ In Counts Two and Three plaintiff contends that Vanderkolk's "Message to the University Community" defamed him.

To prevail on a defamation claim, a plaintiff must prove: (1) a false and defamatory statement concerning plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) damages. *See Abella v. Barringer Resources, Inc.*, 260 N.J.Super. 92, 98, 615 A.2d 288, 291 (Ch.Div.1992). "A defamatory statement is one that is false and 'injurious to the reputation of another' or exposes another person to 'hatred, contempt or ridicule' or subjects another person to 'a loss of good will and confidence' in which she or he is held by others." *Romaine v. Kallinger*, 109 N.J. 282, 290, 537 A.2d 284 (1988) (quoting *Leers v. Green*, 24 N.J. 239, 251, 131 A.2d 781 (1957)). The threshold inquiry in a defamation action is whether the statement is "reasonably susceptible of a defamatory meaning," and this is a question of law. *Id., Decker v. Princeton Packet*, 116 N.J. 418, 424, 561 A.2d 1122 (1989). Moreover, liability for defamation cannot be imposed unless the defendants' statements of fact are "false." Thus, truth is an absolute defense to defamation. *Romaine*, 109 N.J. at 289, 537 A.2d 284; *Lawrence v. Bauer Pub. & Printing Ltd.*, 89 N.J. 451, 446 A.2d 469 (1982).

Vanderkolk's published statement, which did not identify plaintiff by name, is obviously truthful, for plaintiff himself acknowledges that the Annual Report contained errors and that he was partially responsible for them. He also has failed to demonstrate that Vanderkolk's statement was injurious to his reputation and professional standing. The statement reveals no information regarding his employment record but instead merely conveys to the reader that some undefined adverse action has been taken against some unidentified members of the GPA for errors appearing in the Annual Report. Unless someone knew that plaintiff was a member of the department and that he had been discharged, the reader would have no way of knowing that it pertained to plaintiff. The absence of identifying language in the statement compels the Court to reject plaintiff's claim that it defamed him. Therefore, the Court dismisses Counts Two and Three of the Amended Complaint.

## E. *Breach of Contract Claims*

■ In Count Four, plaintiff claims that by publishing Vanderkolk's "Message to the University Community" defendants breached an agreement contained in the UMDNJ Staff Handbook that his employment record would remain confidential. The Handbook states:

> During the course of your employment you may learn of confidential information about patients, co-workers or the University. Continued employment at UMDNJ is conditioned on your taking every possible precaution to ensure complete confidentiality of information. You must be on guard against potential violations of confidentiality whether you are inside the University or standing at the bus stop talking to a co-worker.

(Vanderkolk, Ex. 37 at 26).

As discussed above, the "Message" merely conveys in non-identifiable general language that the employees responsible for the errors in the Annual Report had been disciplined. Therefore, the Court finds that plaintiff has failed to establish any actionable breach of confidentiality.

In Counts Eight and Ten, plaintiff alleges that he and UMDNJ entered into an implied employment contract contained in various oral statements, performance evaluations, and the UMDNJ Staff Handbook. This agreement purportedly guaranteed that he would not be terminated as long as his job performance was satisfactory.

■ As a general rule, "an employer may fire an employee for good reason, bad reason or no reason at all under the employment-at-will doctrine." *Witkowski v. Thomas J Lipton, Inc.*, 136 N.J. 385, 397, 643 A.2d 546 (1994). Thus, "[a]n employment relationship remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise." *Id.* This at-will doctrine applies to public employees like Ditzel. *English v. College of Medicine and Dentistry of N.J.*, 73 N.J. 20, 23, 372 A.2d 295 (1977). However, in *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985), the New Jersey Supreme Court held that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will." *Id.* at 285–286, 491 A.2d 1257. In determining whether an employment contract can be implied from an employee handbook, the court must consider "the reasonable expectations of the employees." *Witkowski*, 136 N.J. at 392, 643 A.2d 546. The definiteness and comprehensiveness of the termination policies and the context of the manual's preparation and distribution both bear on whether employees may reasonably understand an employment manual to provide enforceable obligations. *Id.* at 393, 643 A.2d 546. Still, the employer "may overcome the implication that its employment manual constitutes an enforceable contract" by including a disclaimer notifying employees that they may be terminated at the employer's will. *Nicosia v. Wakefern Food Corp.*, 136 N.J. 401, 412, 643 A.2d 554 (1994).

■ Here, UMDNJ employees could not have reasonably understood the Staff Handbook to create a binding agreement that they would be terminated only for good cause. First, the Staff Handbook did not contain comprehensive and definite provisions on job security and did not state that employees could only be fired for good cause. Second, the Handbook at page seven contained a "clear and prominent" disclaimer that unquestionably informed employees that they could be fired at any time with or without good cause:

### AT WILL

All staff members of UMDNJ not covered by a current union contract are considered employees "at will". This phrase refers to the fact that the University retains the right to terminate employment of "at will" staff members any time, with or without cause or notice. No written or oral statement issued by the University or by any employee or agent of the University can affect your status as an "at will" staff member.

(Vanderkolk, Ex. 37 at 7).

In addition, employees were reminded by page thirty-five of the Handbook that the

University was not offering an employment contract. (Vanderkolk, Ex.37 at 35). This Court finds that each of these pages constitutes a clear and prominent pronouncement that UMDNJ is an at-will employer. Consequently, the Court finds that the Staff Handbook does not create an implied employment contract.

 Moreover, plaintiff's argument that his supervisors created an implied employment contract by making certain oral statements of encouragement and favorable evaluations fails. Plaintiff claims that he had the general understanding that if he performed satisfactorily, his employment would be secure. However, to establish an oral implied employment contract, a plaintiff must show: (1) that the oral employment policy contained "an express or implied promise concerning the terms and conditions of employment"; (2) that the policy was "a definitive, established, company-wide policy"; (3) that the oral statement of policy by a supervisor constituted an "accurate representation of policy"; and (4) that the supervisor was "authorized to make" the oral statements of policy. *Gilbert v. Durand Glass Mfg. Co. Inc.*, 258 N.J.Super. 320, 330–31, 609 A.2d 517, 522 (App.Div.1992). Ditzel cannot meet this burden of proof. He does not claim that his understanding of job security derived from any official UMDNJ policy or that his supervisors told him that UMDNJ had such a policy. Rather, he relies on a general understanding created by favorable evaluations. However, good evaluations and oral praise alone do not create implied agreements to terminate upon good cause only. *Catalane v. Gilian Instrument*, 271 N.J.Super. 476, 495, 638 A.2d 1341 (App.Div.1994). Consequently, this Court finds that plaintiff's understanding regarding his job security was no more than wishful, positive thinking and dismisses Counts Four, Eight and Ten of the Amended Complaint.

## F. *Constitutional Violations*

 In Count Seven, suing under 42 U.S.C. §§ 1983 and 1985, plaintiff alleges that defendants conspired to terminate him in retaliation for his criticism of Vanderkolk's use of the term "white boys" in violation of his First Amendment right to free speech. As the Court has already established, plaintiff was fired for poor performance and not for any discriminatory reason. In addition, plaintiff had complained to Vanderkolk nine months before he was fired. The temporal relationship between his complaint and discharge would be too attenuated, without more, to support a valid claim of discriminatory discharge. The Court finds that plaintiff's claim that he was fired in retaliation for criticizing Vanderkolk's use of the term "white boys" is meritless.

 Plaintiff also claims that defendants violated his due process rights under the Fourteenth Amendment and New Jersey Constitution. To prevail on his Fourteenth Amendment or New Jersey Constitution due process claims, plaintiff must establish that he was deprived of a "property" or "liberty" interest without due process of law. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). To have a "property" interest in continued public employment, an employee "must have more than a unilateral expectation of it. He must instead, have a legitimate claim of entitlement to it" under state law. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. In New Jersey, absent a statutory or contractual entitlement, a public employee such as Ditzel does not have a property interest in his or her job. *See Morgan v. Union County*, 268 N.J.Super. 337, 355, 633 A.2d 985, 993 (App.Div.1993), *certif. denied.*, 135 N.J. 468, 640 A.2d 850 (1994); *Robertson v. Fiore*, 62 F.3d 596, 601 (3d Cir.1995). Therefore, plaintiff cannot base a claim arising from any property interest.

 Nor can Ditzel establish that he was deprived of any liberty interest. An employment termination implicates a liberty interest only if it is based upon a charge of dishonesty, immorality or other moral turpitude and imprints upon an employee a stigma that forecloses his freedom to take advantage of other employment opportunities. *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707; *Robb v. City of Philadelphia*, 733 F.2d 286, 294 (3d Cir.1984).

608

Here, in reference to his defamation claim, Ditzel alleges that the defendants publicly declared in the "Message to the University Family" that the persons responsible for the "serious breach in quality" in the 1993 Annual Report had been disciplined. However, allegations of incompetence or unsatisfactory job performance do not imply the existence of serious character defects such as dishonesty or immorality contemplated by *Roth*, and thus are not the generic accusations that give rise to a constitutionally protected liberty interest. Furthermore, no liberty interest can arise when the defendants' public statements were substantially true. *Fraternal Order of Police v. Tucker*, 868 F.2d 74, 82–83 (3d Cir.1989). Accordingly, because plaintiff has failed to raise any colorable claims in Count Seven, the Court dismisses it as a matter of law.

### G. *Tort Claims*

In Count Nine, plaintiff alleges that the defendants conspired to inflict intentionally or negligently emotional distress upon him. To establish a claim for intentional infliction of emotional distress under New Jersey law, plaintiff must show: (1) conduct that is extreme and outrageous; (2) intent to commit both the act and the severe emotional distress; (3) proximate cause; and (4) that the emotional distress was "so severe that no reasonable man could expect to endure it." *Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 366–367, 368, 544 A.2d 857 (1988) (quoting Restatement (2nd) of Torts, § 46, comment j (1979)). Courts have frequently noted that wrongful discharge claims rarely rise to level of extreme outrageousness required for an actionable emotional distress claim. *See Fregara v. Jet Aviation Business Jets*, 764 F.Supp. 940, 956 (D.N.J. 1991).

Here, at best, plaintiff can only show that Vanderkolk made a few, stray, sarcastic remarks in his presence. They do not rise to the level of extreme outrageousness. Furthermore, plaintiff's claims of negligent infliction of emotional distress in this Count and those same charges of negligence, recklessness and carelessness of Count Eleven are barred by the Worker's Compensation Act, N.J.S.A. 34:15–8. *See Noye v. Hoffmann–La*

*Roche Inc.*, 238 N.J.Super. 430, 438 n. 5, 570 A.2d 12 (App.Div.), *certif. denied*, 122 N.J. 146–147, 584 A.2d 218 (1990); *Cremen v. Harrah's Marina Hotel Casino*, 680 F.Supp. 150, 153 (D.N.J.1988). Accordingly, the Court dismisses Counts Nine and Eleven of the Amended Complaint.

### CONCLUSION

For the reasons stated, the Court dismisses plaintiff's Amended Complaint as a matter of law.

**SO ORDERED.**

### ORDER

This matter having been opened by defendants University of Medicine and Dentistry of New Jersey (UMDNJ), Stanley Bergen and Barbara Vanderkolk for an order granting summary judgment and dismissing the complaint as a matter of law; and the Court having considered the defendants' moving papers and the record and for good cause shown;

It is on this 14th day of April 1997;

ORDERED that defendants' motion for summary judgment is **granted**;

ORDERED that plaintiff's complaint is **dismissed**.