MARCY G. DECKER, INDIVIDUALLY; MARCY G. DECKER, AS CUSTODIAL PARENT OF JACKSON T. DECKER; AND CHARLOTTE GOLDBERG, PLAINTIFFS–APPELLANTS, v. THE PRINCETON PACKET, INC., A DELAWARE CORPORATION, DEFENDANT–RESPONDENT, AND JOHN DOE, WHOSE NAME IS FICTITIOUS; AND ABC CORPORATION, WHOSE IDENTITY IS UNKNOWN, JOINTLY, INDIVIDUALLY, OR IN THE ALTERNATIVE, DEFENDANTS.

Argued January 17, 1989—Decided August 8, 1989.

*Louise M. Robichaud* argued the cause for appellants.

*Gerard H. Hanson* argued the cause for respondent (*Brener, Wallack & Hill,* attorneys; *Marilyn S. Silvia,* on the brief).

*Thomas J. Cafferty* argued the cause for *amicus curiae,* New Jersey Press Association (*McGimpsey & Cafferty,* attorneys; *Thomas J. Cafferty* and *A.F. McGimpsey, Jr.,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This case involves a tort action brought against a newspaper seeking damages for defamation and emotional distress attributable to the publication of a false obituary. The Court is called on to address whether an obituary that reports a death, this being the only false statement, can possibly have a defamatory interpretation. In addition, the Court must decide whether the publication of a false obituary can give rise to damages for the negligent infliction of emotional harm. The trial court and Appellate Division held that defamation and emotional-harm claims were without merit as a matter of law. Plaintiffs appeal these rulings arguing that defendant's publication of a false obituary without verifying its accuracy caused damage to reputation and emotional harm that should be compensated under our tort law.

I.

On February 15, 1985, the defendant, a newspaper, The Princeton Packet, Inc. ("The Packet"), which publishes on Tues-

day and Friday of each week, reported the following obituary for Marcy Goldberg Decker, the plaintiff:

> Marcy Goldberg Decker of Princeton died suddenly Feb. 11. She was 31. Ms. Goldberg was the fiance of Robert J. Feldman of Princeton.
>
> She was a lifelong resident of Princeton and is survived by a son, Jackson T.; her mother, Charlotte Goldberg of Trenton; and a brother, Ronald Goldberg of California.
>
> Funeral arrangements were incomplete at press time.

This obituary was incorrect because Marcy Decker was not dead. All other information in the obituary—her age, residence, and family relationships—was accurate (except, of course, the references to those circumstances in the past tense and the funeral arrangements). Plaintiff notified defendant by a telephone call two days after the publication that she was in fact alive. The Packet printed the following retraction on February 19, 1985:

> The Packet erroneously reported in Friday's edition that Marcy Decker of Princeton died Feb. 11. The obituary was false. The Packet regrets the error and any inconvenience this may have caused Ms. Decker and her family.

On February 14, 1986, Marcy Decker, her son, Jackson Decker, and her mother, Charlotte Goldberg, filed a complaint against The Packet and the unknown John Doe who submitted the obituary notice, alleging (i) libel; (ii) negligent infliction of emotional distress; (iii) intentional infliction of emotional distress; and (iv) gross negligence. The Packet responded by filing a motion for summary judgment, contending that the publication of a false obituary is not defamatory as a matter of law, and that the first amendment barred this lawsuit.

During discovery, the following facts became available about plaintiffs' claims against defendant. First, plaintiffs alleged that when the obituary was published, plaintiff Marcy Decker "was under extreme emotional distress" that was "aggravated" by the publication. At that time, she was in an "emotional" legal battle with her former fiance as well as a custody battle with her former husband and had attempted suicide twice *prior* to the publication of the obituary. She also claims that "due in part to the publication of the false obituary and its effect on

her" she lost her employment and stopped looking for housing in Princeton and moved to Pennsylvania. In addition, she stated that her husband tried to use the false obituary in the custody battle over their child. Finally, she argued that her son and mother suffered "extreme embarrassment and humiliation and anxiety" attributable to the publication of the obituary, which entitled them to compensation.

Plaintiffs deposed three employees of defendant to establish their claims that The Packet was unaware of who had submitted the obituary, that it took no steps to determine the validity of the notice, and that it would not have published the obituary had the person normally in charge of obituaries been on the job. The depositions showed that The Packet normally receives obituaries through three sources: (1) other area daily newspapers, (2) funeral directors, and (3) press releases left in a box maintained for that purpose in the lobby.

Mr. Willever, the editor of The Packet, testified that the normal procedure at The Packet in 1985 was to verify the information contained in the obituary by communicating with the funeral home or calling the telephone number on the press release. Ms. Willever noted that generally any release he had ever done had a telephone number on it. He also testified that The Packet does not normally retain information it receives for the publication of obituaries and that there was no record of who handled this notice.

Mr. Chimenti, the executive editor in charge of the day-to-day operations of the Packet in 1985, testified that he was the person who found Ms. Decker's obituary in the press-release box in the lobby, and he made the decision to publish it without any attempt to verify the information in the release. He stated that the notice was typed on 8½ × 11 white bond paper, was not in an envelope, was unsigned with no telephone number on it, and that he could not remember whether it was dated. He did not know of any accepted procedure in the newspaper community concerning the publication of obituaries, but testi-

fied that it was normal procedure for The Packet and the general newspaper community to publish press releases without signatures or telephone numbers. Mr. Chimenti claimed that when death notices came in the form of press releases, they were treated like any other press release and published without further verification. He estimated that the percentage of obituaries received from individuals is very small. Finally, he testified that the notice for Marcy Decker's obituary was thrown away and was unlikely to ever be found.

The third employee deposed was Gloria Halpern, the Lifestyle Editor of The Packet. She testified that she normally handled obituaries but was on vacation at the time that Ms. Decker's obituary was published. Ms. Halpern stated that about five percent of obituary notices are from private individuals, that some press releases do not have telephone numbers, and that she would call the family to verify any unsigned obituary. She reported that there was and still is no formal written policy concerning the publication of obituaries, but the understanding is that now all obituaries are to be verified.

The trial court entered summary judgment in favor of defendant and dismissed plaintiffs' complaint. It concluded that as a matter of law "the mere publication of a false notice of death is not defamatory and cannot support any claims for libel in this case." According to the court, the obituary "does not impute to the plaintiff anything wrong, It doesn't hold her up to ridicule." It also dismissed the defamation claims of Ms. Decker's mother and son, holding that they could not be defamed by a false notice concerning Ms. Decker, as the statement was not directed towards them.

Finally, the court concluded that plaintiffs were not entitled to any recovery based on any claims for negligent or intentional infliction of emotional distress. It rejected plaintiffs' negligent-infliction-of-emotional-distress claim because New Jersey case law does not allow recovery for the negligent infliction of

emotional distress outside the zone-of-risk and family-observation theories.

Plaintiffs appealed to the Appellate Division, which upheld the trial court's ruling, *Decker v. The Princeton Packet, Inc.*, 224 *N.J.Super.* 726 (1988). In rejecting plaintiffs' defamation claims, the appellate court stated that

[w]hile we appreciate the shock plaintiff may have felt in reading of her death, it was necessarily quickly dissipated by her certain knowledge the announcement was premature. That defendant made a mistake is patent but this is not sufficient to give rise to a claim for money damages. The announcement itself contained no defamatory material. Other than incorrectly stating that defendant had died suddenly, the obituary was accurate and not uncomplimentary. [*Id.* at 728.]

The court concluded that "the general rule is well established that the mere publication of an improvident obituary is not defamatory in the absence of additional material of a defamatory nature published in connection therewith." *Ibid.* The court also upheld the dismissal of the emotional-distress claims. The court did not rule on plaintffs' intentional infliction of emotional distress claims because Ms. Decker's attorney had conceded at the oral argument that she could not prove intention. *Id.* at 729. However, the Appellate Division agreed with the trial court that plaintiffs did not state a cause of action for the negligent infliction of emotional harm. *Ibid.*

Plaintiffs then petitioned this Court for certification on the issues of defamation and negligent infliction of emotional distress, which was granted. 111 *N.J.* 648 (1988).

## II.

It is well established that the threshold issue in any defamation action—"whether the language used is reasonably susceptible of a defamatory meaning"—is a question of law for the court. *Kotlikoff v. The Community News*, 89 *N.J.* 62, 67 (1982); *Romaine v. Kallinger*, 109 *N.J.* 282, 290 (1988); *Lawrence v. Bauer Publishing & Printing, Ltd.*, 89 *N.J.* 451, 459 (1982), *cert.* den., 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982); *Coleman v. Newark Morning Ledger Co.*, 29 *N.J.* 357,

382 (1959); *Karnell v. Campbell,* 206 *N.J.Super.* 81, 88 (App.
Div.1985); *Herrmann v. Newark Morning Ledger Co.,* 48
*N.J.Super.* 420, 429–30 (App.Div.1958), aff'd on rehearing, 49
*N.J.Super.* 551 (App.Div.1958). That is the threshold issue in
this case: whether the publication of the false obituary, the
only inaccuracy being the announcement of death, can be
considered defamatory.

In making this determination, the court must evaluate
the criticized language "according to the fair and natural mean-
ing which it would be given by persons of ordinary intelli-
gence." *Herrmann v. Newark Morning Ledger Co., supra,* 48
*N.J.Super.* at 431; *Molnar v. Star Ledger,* 193 *N.J.Super.* 12,
18 (App.Div.1984). The allegedly defamatory statement must
be taken in context and the publication considered as a whole.
*Cibenko v. Worth Publishers, Inc.,* 510 *F.Supp.* 761, 764 (D.N.
J.1981); *MacRae v. Afro–American Co.,* 172 *F.Supp.* 184, 186
(E.D.Pa.1959); *Mick v. American Dental Ass'n,* 49 *N.J.Super.*
262, 274 (App.Div.1958), certif. den., 27 *N.J.* 74 (1958); *see
Kotlikoff v. The Community News, supra,* 89 *N.J.* at 72.

The court must decide the meaning that a reasonable
person would give the language, and if it is capable of both a
defamatory and nondefamatory meaning, then a question of
fact arises for the jury to decide. *Lawrence v. Bauer Publish-
ing & Printing Ltd., supra,* 89 *N.J.* at 459; *Karnell v. Camp-
bell, supra,* 206 *N.J.Super.* at 88. Where the criticized state-
ments, however, are not capable of a defamatory meaning, the
court is entitled to dismiss summarily a plaintiff's action. *Kot-
likoff v. The Community News, supra,* 89 *N.J.* at 67–68; *see
Barbetta Agency, Inc. v. Evening News Publishing Co.,* 135
*N.J.Super.* 214, 218 (App.Div.1975). Thus, if a statement is
susceptible of only a non-defamatory meaning, "it cannot be
considered libelous, justifying dismissal of the action." *Ro-
maine v. Kallinger, supra,* 109 *N.J.* at 290.

A defamatory statement is one that is false and is " 'injurious
to the reputation of another' or exposes another person to

'hatred, contempt or ridicule' or subjects another person to 'a loss of the good will and confidence' in which he or she is held by others." *Id.* at 289; *Leers v. Green*, 24 *N.J.* 239, 251 (1957); *see* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts*, § 111 at 773–78 (5th ed. 1984); *see also Restatement (Second) of Torts* § 559 (1977) (a defamatory communication is one that "tends so to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). Thus, if the statement of Marcy Decker's death in the false obituary could be interpreted by a reasonable person to expose the plaintiff to "hatred, contempt, ridicule or disgrace or subject ... [her] to loss of the good will and confidence of the community," *Mosler v. Whelan*, 28 *N.J.* 397, 400 (1958), then her action for defamation could proceed to trial.

The principle generally endorsed by most authority throughout the country is that an obituary in which the only false statement concerns the death of the individual, published without malicious intent, is not defamatory *per se.* *See* 50 *Am. Jur.*2d, Libel and Slander § 85 (1970) ("Generally the publication of a death notice falsely reporting the plaintiff's death is not actionable per se, but a contrary rule prevails if the notice is published maliciously and is intended to subject another to ridicule."); *Rubinstein v. New York Post Corp.*, 128 *Misc.*2d 1, 488 *N.Y.S.*2d 331 (N.Y.Sup.Ct.1985); *Estill v. Hearst Publishing Co.*, 186 *F.*2d 1017, 1022 (7th Cir.1951); *O'Neil v. Edmonds*, 157 *F.Supp.* 649 (E.D.Va.1958); *Cardiff v. Brooklyn Eagle, Inc.*, 190 *Misc.* 730, 75 *N.Y.S.*2d 222 (1947); *Curry v. Journal Publishing Co.*, 41 *N.M.* 318, 68 *P.*2d 168 (1937); *Cohen v. New York Times Co.*, 153 *A.D.* 242, 138 *N.Y.S.* 206 (1912). These cases suggest that publication of a notice of death is usually not defamatory because it does not injure one's reputation. As one court explained, "one is [not] demeaned or belittled by the report of his or her death." *Rubinstein v. New York Post Corp., supra*, 128 *Misc.*2d at 3, 488 *N.Y.S.*2d at 333.

The general rule, however, does have an exception where the false obituary contains additional false information that may be defamatory. For example, in *Estill v. Hearst Publishing Co.,* *supra,* the plaintiff was an attorney who sued for defamation based, in part, on the false report of his death that was reported to have resulted from his association with the "late outlaw, John Dillinger, whose influence on those whom he came in contact with was completely evil." 186 *F.*2d at 1019. The story implied that plaintiff died a "broken man" because of "the 'strange curse' which doomed all of Dillinger's associates." *Id.* at 1021–22. The *Estill* court allowed plaintiff to bring a suit for defamation not because of the report of death itself, but because of other information that accompanied the death notice:

> Ordinarily it is not actionable *per se* to misstate the facts of a person's death. However, here defendant not only falsely stated that plaintiff had died, but purported to state the circumstances under which he died, "a broken man." By his complaint plaintiff alleged that this was injurious to him personally and in his professional capacity as an attorney, and had done great damage to his earning capacity as such attorney. We cannot agree that he stated no cause of action. [*Id.* at 1022.]

Moreover, if the written report of death includes statements that the person had died under disgraceful circumstances, then the issue of defamation encompasses more than the mere publication of a false report of death. *O'Neil v. Edmonds, supra,* 157 *F.Supp.* at 650. Thus, where an obituary not only falsely states the death of a person but also falsely states circumstances surrounding the death and those circumstances might be interpreted as defamatory, a libel action can survive summary dismissal.

This Court finds that the general rule and its limited exception should govern this case and other similar cases. Here, the only false aspect of the obituary was the death of plaintiff Marcy Decker. Therefore, under the general rule, the obituary is not defamatory *per se* because the reported death of an individual when viewed from the perspective of a reasonable person of ordinary intelligence and experience does not impugn

reputation. As the trial court observed, the publication of the death notice did not impute to the plaintiff, any wrong and did not hold her up to ridicule. Death is a natural state and demeans no one.

This result is also consistent with the policy reasons that undergird the law of defamation, particularly as it affects media defendants. "The evolution of the law of defamation reflects the tension between society's competing interests in encouraging the free flow of information about matters of public concern and in protecting an individual's reputation." *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 *N.J.* 125, 135–36 (1986). The publication of obituaries is a function that is almost invariably undertaken by the media and this information is considered newsworthy and clearly a matter of public interest that should be encouraged. *Rubinstein v. New York Post Corp., supra,* 128 *Misc.*2d at 3, 488 *N.Y.S.*2d at 333. Moreover, the chance of an obituary being incorrect appears slight, and the newspaper can promptly publish a correction, which occurred in this case. Thus, the plaintiffs did have an adequate remedy to correct any false statement and the published correction should have prevented the false obituary from causing any continuing effects. As one court stated: "[i]t is one of those errors which will occur in the publication of a newspaper, but this is not to say that all erroneous reports give rise to an action for libel." *O'Neil v. Edmonds, supra,* 157 *F.Supp.* at 651. Thus, the rule followed in this case properly allows the free flow of information and yet it affords protection to the reputation of persons who are defamed by a false obituary if the obituary includes defamatory information or is published with the intent to injure. Therefore, we hold that where a newspaper mistakenly prints an obituary for a person who is still alive and then retracts its mistake, there is no defamation *per se*, since announcing the death of someone is not by itself injurious to one's reputation.

### III.

The second claim before this Court is that the actions of defendant establish liability under the tort of negligent infliction of emotional harm. Plaintiff Marcy Decker conceded before the Appellate Division that she could not prove intentional infliction of harm. 224 *N.J.Super.* at 729. However, plaintiff alleged that the publication of the false obituary based on an unsigned death notice left at defendant's office without any attempt to ascertain its truth or falsity constituted negligence that caused her emotional distress. These injuries included the loss of her job in part due to the obituary, her husband's use of the obituary against her in a custody battle, and the aggravation of emotional distress.

The tort involving the negligent infliction of emotional distress can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care. Dreschsel, "Negligent Infliction of Emotional Distress: New Tort Problem for the Mass Media," 12 *Pepperdine L.Rev.* 889, 896 (1985) [hereinafter Dreschsel]. Thus, to establish liability for such a tort, a plaintiff must prove that defendant's conduct was negligent and proximately caused plaintiff's injuries. The negligence of defendant, however, depends on whether defendant owes a duty of care to the plaintiff, which is analyzed in terms of foreseeability. "[L]iability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted." *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 76 (1966).

While the foreseeability of injurious consequences is a constituent element in a tort action, foreseeability of injury is particularly important in the tort of negligent infliction of emotional harm. This reflects the concern over the genuineness of an injury consisting of emotional distress without consequent physical injury. In these situations, there must be "an especial likelihood of genuine and serious mental distress,

arising from special circumstances, which serves as a guarantee that the claim is not spurious." *Prosser & Keeton, supra,* § 54 at 362. In emotional distress cases, there has been "a constant concern about the genuineness of the claim."

> The progression has been from denying recovery unless the emotional distress is accompanied by physical impact, *Eyrich for Eyrich v. Dam,* 193 *N.J.Super.* 244, 252 (App.Div.), cert. denied, 97 *N.J.* 583 (1984), to permitting recovery if the emotional distress results in physical injury, *Falzone v. Busch,* 45 *N.J.* 559, 569 (1965). More recently, we have found a sufficient guarantee of genuineness, even in the absence of physical injury, if the plaintiff perceives an injury to another at the scene of the accident, the plaintiff and the victim are members of the same family, and the emotional distress is severe. *Portee v. Jaffee,* 84 *N.J.* 88, 93 (1980). [*Buckley v. Trenton Sav. Fund Soc'y,* 111 *N.J.* 355, 365 (1988).]

Thus, recovery for negligent infliction of emotional harm requires that it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons. *See, e.g., Giardina v. Bennett,* 111 *N.J.* 412, 417 (1988); *Buckley v. Trenton Sav. Fund Soc'y, supra,* 111 *N.J.* 355; *Procanik v. Cillo,* 97 *N.J.* 339 (1984); *Schroeder v. Perkel,* 87 *N.J.* 53 (1981); *Portee v. Jaffee,* 84 *N.J.* 88 (1980); *Berman v. Allan,* 80 *N.J.* 421 (1979).

Unless a plaintiff's alleged distress is truly genuine and substantial, the tort of negligent infliction should not be broadened to permit recovery of damages. Hence, the genuineness and severity of emotional distress can present threshold questions of law. In cases involving claims relating solely to emotional distress,

> [t]he severity of the emotional distress raises questions of both law and fact. Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved. [*Buckley v. Trenton Sav. Fund Soc'y, supra,* 111 *N.J.* at 367.]

Thus, in the *Buckley* case, the Court observed that plaintiff's emotional-distress "complaints amount to nothing more than aggravation, embarrassment, an unspecified number of headaches, and loss of sleep," and, as a matter of law, could not constitute severe mental distress sufficient to impose liability. *Id.* at 368.

In cases involving false obituaries, the same factors that have impelled courts to conclude that the false report of death is not intrinsically defamatory as a matter of law justify the conclusion that any alleged emotional distress attributable to such a false obituary cannot constitute a compensable injury as a matter of law. Thus, with respect to a false obituary, it was observed:

> The item states that an event has come to pass which is looked for in the history of man, is regarded as beyond his control, and, therefore does not permit the inference that a man has done any act or suffered any act which he could not have done or which he need not have suffered. Prematurity is the sole peculiarity. How can the publication of such an event merely as a matter of news, hold up the subject to scorn, to hatred, to contempt, or to ridicule, so that his reputation is impaired? Such publication may be unpleasant; it may annoy or irk the subject thereof; it may subject him to joke or to jest or to banter from those who knew him or knew of him, even to the extent of affecting his feelings; but this in itself is not enough. (Citations omitted). [*Cohen v. New York Times Co.*, *supra*, 153 *A.D.* at 246, 138 *N.Y.S.* at 210.]

■ In this case, the emotional distress alleged by Marcy Decker resulting from the false report of her death, and, derivatively, the emotional distress assertedly experienced by Ms. Decker's son and mother, are not materially different from that described in cases like *Buckley*, *supra*, 111 *N.J.* 355, in which the injury is not sufficiently palpable, severe, or enduring to justify the imposition of liability and the award of compensatory damages. Rather the alleged emotional distress approximates the subjective reactions of ordinary persons who feel victimized by the false report of death, namely, annoyance, embarrassment, and irritation. Further, the distress experienced by Ms. Decker was not occasioned by conduct that itself was egregious or purposeful. Rather it appears to have been caused only by inadvertent conduct, with respect to which there is no suggestion in the record that any serious and substantial distress on the part of Ms. Decker and her family would be particularly foreseeable. These considerations dictate rejection of the claim for the negligent infliction of emotional distress under these circumstances as a matter of law.

■ We add, further, that this holding, which is applicable to a claim against a medium defendant, is consistent with the policies that are served by the law of defamation and first amendment principles. Several federal courts have addressed the standard of conduct necessary to trigger liability for negligent infliction of emotional harm by a medium defendant also being sued for defamation. They have found that the first amendment requires that plaintiff establish at least the same level of intent to recover for the infliction of emotional harm as is necessary to find defamation. *See Hustler Magazine v. Jerry Falwell,* 485 *U.S.* 46, 108 *S.Ct.* 876, 99 *L.Ed.*2d 41 (1988); *Apostle v. Booth Newspapers, Inc.,* 572 *F.Supp.* 897 (W.D. Mich.1983); *Parnell v. Booth Newspapers, Inc.,* 572 *F.Supp.* 909 (W.D.Mich.1983); *Tumminello v. The Bergen Evening Record, Inc.,* 454 *F.Supp.* 1156 (D.N.J.1978). If the levels of culpability were not at least as stringent, plaintiffs would be able to use the tort of negligent infliction of emotional distress to overcome defenses to defamation actions, to avoid short statutes of limitations for defamation, and to circumvent judicial barriers to punitive damages. *See* Dreschsel, *supra,* 12 *Pepperdine L.Rev.* at 890; Mead, "Suing Media for Emotional Distress: A Multi–Method Analysis of Tort Law Evolution," 23 *Washburn L.J.* 24, 25 (1983). There is, in other words, a certain symmetry or parallel between claims of emotional distress and defamation that calls for consistent results. Thus, it comports with first amendment protections to deny an emotional-distress claim based on a false publication that engenders no defamation *per se.* In this case, by determining that as a matter of law a false obituary does not injure reputation or cause compensable emotional distress, the Court preserves the libel law's first amendment protections for the media.

## IV.

In conclusion, we determine that the negligent publication of a false obituary, the falsity of which relates only to the inaccurate or untrue report of death, is not defamatory *per se* as a

matter of law. We determine also that any emotional distress proximately caused by the publication of such a false obituary is not, as a matter of law, sufficiently substantial to constitute a compensable injury.

Accordingly, the judgment below is affirmed.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—None.