869 A.2d 457 (2005)
376 N.J. Super. 135
Leslie Ann A. COLE, Robert D. Camac, Clinton W. Camac, Michael F. Camac, Eugene Camac, and Gail Camac Foraker, Plaintiffs-Appellants, and
Joyce A. Camac, Plaintiff,
v.
LAUGHREY FUNERAL HOME, Tracy Stranahan and Michael Stranahan, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted February 16, 2005.
Decided March 22, 2005.
*458 Lummis, Krell & Baker, attorneys for appellants (Theodore E. Baker, Bridgeton, on the brief).
Margolis Edelstein, attorneys for respondent Laughrey Funeral Home (Colleen M. Ready, of counsel; Ian M. Sirota, Westmont, on the brief).
Cozen O'Connor, attorneys for respondents Tracy Stranahan and Michael Stranahan *459 (James H. Heller, Philadelphia, PA, on the brief).
Before Judges AXELRAD, COLEMAN and HOLSTON.
The opinion of the court was delivered by
HOLSTON, J.A.D.
Plaintiffs, Leslie Ann Cole (Leslie Ann), Robert D. Camac (Robert D.), Clinton W. Camac (Clinton), Michael F. Camac (Michael F.), Eugene Camac (Eugene), and Gail Camac Foraker (Gail), appeal the January 30, 2004 order granting summary judgment by which the trial court dismissed plaintiffs' Consumer Fraud Act (CFA) claims against defendant, Laughrey Funeral Home (Laughrey), and dismissed plaintiffs' intentional and negligent infliction of emotional distress claims against defendants, Tracy Stranahan (Tracy) and Michael Stranahan (Michael).[1] Plaintiffs also appeal the March 12, 2004 order denying plaintiffs' motion for reconsideration.[2]
On December 6, 2001, Robert W. Camac (Robert W.) and his wife, Maryann Camac (Maryann), were shot and killed in their home by their stepson, Wade Russell. Robert W. is survived by the natural children of his first marriage, Leslie Ann, Clinton, Robert D. and Michael F. He is also survived by his brother, Eugene, his sister, Gail, and a cousin, Joyce. Additionally, Robert W. also left surviving his adopted daughter, Tracy, who he raised since age six. Tracy was the natural daughter of his wife, Maryann. Tracy is married to Michael.
Tracy, as the closest next of kin of Robert W. and the only next of kin of Maryann except for Wade Russell, initiated steps for the funeral of her parents. Tracy retained the services of Laughrey and signed a contract with Laughrey for the funerals of both Robert W. and Maryann. The contract with Laughrey included arrangements for the viewing and funeral services for both of Tracy's parents. Plaintiffs were not involved in making arrangements for the funeral, the funeral services or making decisions with respect to whether or not a viewing of the decedents would be held. Without plaintiffs having any contact with the funeral home, Tracy and Michael made all arrangements with respect to the funeral, the services, and whether a viewing would take place.
Robert W. was clearly not close with the children from his first marriage: Robert D. had not seen his father in thirty years; forty-one year old Clinton had not seen him since he was four or five years old; forty-four year old Leslie Ann had not seen her father since she was sixteen; and Michael F. saw his father once or twice a year and had only seen him about four times in the three years before his death. Decedent's brother and sister were not close enough to him to know he had adopted Tracy. Tracy lived with her father and her mother from the time she was six years old.
Plaintiffs allege that Tracy dictated and controlled the events surrounding the funeral and viewing and arranged for, with *460 the consent and assistance of Laughrey, a private viewing for Tracy and her side of the family, excluding plaintiffs from participating in a viewing of Robert W. and excluding plaintiffs generally in the funeral arrangements.
Tracy consulted with Leslie Ann in an attempt to compromise on the funeral and burial arrangements. It was decided that the funeral service would be conducted by Laughrey but that the burial of Robert W. would take place in Delaware at Gracelawn Cemetery, the cemetery preferred by Leslie Ann and her siblings.
Prior to the funeral, Joyce contacted Leslie Ann and asked if Reverend Jack Cordell could take part in the service. Tracy agreed to this and Reverend Cordell did, in fact, participate in the service at Joyce's request. Leslie Ann also provided Michael with information in order to help him prepare the obituary.
At the funeral, Michael asked Clinton and Leslie Ann if they would like to stand next to their father's casket. Michael asked Eugene if he or any of Robert W.'s sons would like to be pallbearers. Eugene and his son, Kevin, were pallbearers.
Tracy and Michael intended to have a closed-casket funeral because of John Laughrey's comments to them concerning the condition of her parents' remains as a result of their murders and autopsies. However, late on Wednesday evening, December 12, 2001, while at the funeral home delivering the clothes that Robert W. and Maryann were to be buried in and after learning that her parents' bodies were in the very next room, Tracy decided that she wanted to view them. John Laughrey tried to dissuade Tracy from viewing her parents because of the condition of their bodies, but Tracy nevertheless decided to have a viewing and scheduled it for the following evening, the night before the funeral.
Tracy wanted an intimate viewing, and the people who she and Michael invited were Tracy's grandparents, James and Dee McGoldrick; her aunt and uncle, Karen and Kevin McGoldrick; and Michael's mother, Dee Stranahan. However, without either Michael's or Tracy's consent, Tracy's grandparents invited additional people who attended the private viewing.
Plaintiffs never requested a viewing of Robert W., and neither Tracy, Michael, nor anyone at Laughrey told any of them that they could not have a viewing. Leslie Ann testified that she never asked Tracy or Michael for a viewing between December 6 and December 14, 2001. Eugene indicated that he never had a conversation with Tracy or Michael concerning a viewing and that no one stated that a viewing could not be had. Joyce stated that she never asked the Stranahans if it would be permissible for the Camac side of the family to have a viewing. Gail testified that she never asked about a viewing nor did anyone tell her that she could not have one. Michael F. testified that he never requested a viewing of his father and that no one said that he could not have a viewing. John Laughrey testified that if plaintiffs had requested a viewing of Robert W., he would have permitted them to view him. Although there was no public viewing of the decedents' bodies, there was a viewing in the sense of a gathering to pay respects at the funeral home prior to the funeral service.
Plaintiffs allege that Laughrey committed a violation of the CFA based on its affirmative misrepresentations to them that there would be a viewing and in its intentional failure to inform them of the private viewing held for the Stranahan side of the family. Plaintiffs claim that Laughrey's affirmative misrepresentations falsely misled and deceived them into believing *461 that an open viewing of their father/brother would take place by virtue of the obituary notices in several newspapers advising that there would be a public viewing between 10:00 a.m. and 1:00 p.m. on December 14, 2001. Later, plaintiffs claim they were misled by John Laughrey informing them that their father's/brother's body was badly disfigured and by John Laughrey advising them against a viewing.
Plaintiffs point to the statement of Julia Russell Wright (Julia), Wade Russell's former wife, who attended the private viewing. Julia indicated that the bodies were not too disfigured to have allowed a viewing and that the decedents appeared to be presentable. Clinton testified that John Laughrey advised him when he telephoned the funeral home on December 11, 2001 that there would be a public viewing from 10:00 a.m. to 1:00 p.m. on December 14, 2001 and that he should arrive at 9:30 a.m.
The intentional misrepresentation constituting an act of omission was in Laughrey's failure to advise any of the plaintiffs about the private viewing held for the benefit of Tracy and Michael and that they, too, would be entitled to a private viewing of Robert W. Plaintiffs, therefore, allege that the misrepresentations by Laughrey contained in the obituary notices and to Clinton by telephone that a viewing would be held, the misrepresentations to family members that because of the condition of the decedents' bodies that no public viewing should be held, and the concealment from them of the separate private viewing for the Stranahans constituted unconscionable and deceitful commercial practices in violation of the CFA.
Plaintiffs allege that the Stranahans either negligently or intentionally misled or deceived them in believing that no viewing was possible because of their father's disfigured body from the gunshot wound and autopsy. They contend Tracy and Michael are, thus, liable based on legal theories of intentional infliction of emotional distress and negligent infliction of emotional distress because plaintiffs were deprived of the opportunity to attend a viewing of their father/brother.
Plaintiffs allege that the conduct of the Stranahans in misrepresenting that a viewing would be held and then concealing that a private viewing was held was done intentionally to cause them emotional distress and to demean their relationship with their father/brother. Plaintiffs seek damages for the emotional distress that was inflicted upon them by defendants' conduct.
Plaintiffs present the following arguments for our consideration.
POINT I
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LAUGHREY FUNERAL HOME BECAUSE A FUNERAL HOME CANNOT MISLEAD FAMILY MEMBERS AS TO THE CONDITION OF BODIES AND A VIEWING WITHOUT RUNNING AFOUL OF THE CONSUMER FRAUD ACT, N.J.S.A. 56:8-1, ET SEQ.

POINT II
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO TRACY AND MICHAEL STRANAHAN BECAUSE THE FACT FINDER COULD DETERMINE THAT THE STRANAHANS INTENTIONALLY INFLICTED EMOTIONAL DISTRESS UPON THE PLAINTIFFS AND THAT THE DAMAGES WERE EITHER ACTUAL OR INSUFFICIENT AS A MATTER OF LAW.

I
The CFA, N.J.S.A. 56:8-2, in applicable part, states:

*462 The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]
Plaintiffs argue that the term "merchandise" as set forth in N.J.S.A. 56:8-1(c) includes "services or anything offered, directly or indirectly to the public for sale[.]" Thus, "merchandise" includes services in the nature of those provided by a funeral home.
Plaintiffs contend that the applicability of the CFA to Laughrey is evidenced by the fact that the Board of Mortuary Science is constituted within the Division of Consumer Affairs and, therefore, these types of services were intended to fall within the purview of the CFA. Laughrey, however, argues that the CFA does not apply to a funeral home. See N.J.S.A. 45:7-32; Morgan v. Air Brook Limousine, Inc., 211 N.J.Super. 84, 94-96, 510 A.2d 1197 (Law Div.1986).
Because we conclude that the Supreme Court's decision in Gennari v. Weichert Co. Realtors, 148 N.J. 582, 691 A.2d 350 (1997), governs our disposition of this appeal, we need not decide whether the CFA applies to a contract with a funeral home for funeral services. The issue in Gennari was whether Weichert Realtors, as the sales agent of a residential real estate developer, was liable under the CFA for damages to purchasers of homes from the developer. Id. at 589-90, 691 A.2d 350. Weichert was intimately involved in the sale of houses to purchasers in a housing development known as Squire's Runne. Id. at 590, 691 A.2d 350. Weichert provided a sales trailer and signs at the site and paid for advertising, telephone costs and a sales brochure pursuant to a listing agreement with Allen Rumberg, the builder. Ibid. Weichert did not verify the information provided by Rumberg nor confirm Weichert's representations to prospective purchasers concerning Rumberg and his workmanship or quality of construction. Plaintiffs alleged damages resulting from numerous and varied construction defects. Id. at 590-92, 691 A.2d 350.
The Supreme Court concluded that Weichert made affirmative representations about the builder's experience and qualifications and about the quality of his homes. Id. at 606, 691 A.2d 350. The Court concluded that for plaintiffs to prevail, "the purchasers need not show that Weichert agents knew that the misrepresentations were false or that Weichert intended to deceive them." Id. at 607, 691 A.2d 350.
However, the Court, quoting favorably to this court's opinion in Gennari, determined, "`[n]ot just any erroneous statement will constitute a misrepresentation prohibited by [the Act]. The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase.'" Ibid. (quoting Gennari v. Weichert Co. Realtors, 288 N.J.Super. 504, 535, 672 A.2d 1190 (App.Div.1996)) (internal citations omitted) (emphasis added).
A crucial factor required by Gennari not present here is that the alleged misrepresentations (the publication of the obituary, the response to the telephone query concerning a viewing, the recommendation against an open casket and the failure to *463 inform of the private viewing) were all acts done after the contract for funeral services was entered into between Tracy and Laughrey. The misrepresentations alleged here were, therefore, not misrepresentations made to induce the buyer to make the purchase of funeral services from Laughrey.
Gennari also makes clear that non-economic damages are not recoverable under the CFA. Id. at 612, 691 A.2d 350. In Gennari, the purchasers sought to recover damages for "`foreseeable consequences including interference with beneficial use and enjoyment of [the] new homes.'" Ibid. The Court cited favorably to the Law Division's holding in Jones v. Sportelli, 166 N.J.Super. 383, 391-92, 399 A.2d 1047 (Law Div.1979), which held that treble damages under the CFA are limited only to "`ascertainable loss of moneys or property.'" Ibid. (quoting N.J.S.A. 56:8-19).[3] The Court, in concluding that non-economic losses are not recoverable under the CFA, stated:
Whether non-economic damages are recoverable under the Act is unclear. The Act states:
Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person [who commits a violation under the Act] .... [T]he court shall, in addition to any other appropriate legal or equitable relief, award threefold damages, sustained by any person in interest.
[N.J.S.A. 56:8-19 (emphasis added).]
One reading of the Act is that a party who suffers any ascertainable loss has standing to sue and can recover three times "any and all damages sustained." The alternative, and we believe more appropriate, interpretation is that "damages" are limited to "ascertainable loss." At common law an injured party could recover only for the injuries sustained. Absent a clear expression of legislative intent changing the common-law rule, we are reluctant to read the Act to encompass non-economic losses.
[Id. at 612-13, 691 A.2d 350.]
The damages sought by plaintiffs here, as outlined in the certifications contained in plaintiffs' appendix to their appellate brief, recite how they were emotionally affected by their inability to have an open viewing of Robert W. Those damages constitute non-economic losses that are not recoverable under the CFA.
Plaintiffs do not list as an appealable issue the judge's dismissal of their claim for breach of contract. Plaintiffs also do not assert as a damages claim their alleged agreement with Tracy to be responsible for eighty percent of the funeral bill. The June 8, 2003 statement from Laughrey for funeral services and costs associated with the funeral was directed by Laughrey to Tracy Camac Shanahan only. The funeral statement was not directed to the estates of Robert W. and Maryann Camac.

*464 II
Plaintiffs allege that Tracy and Michael either negligently or intentionally inflicted emotional distress upon them. Plaintiffs contend the Stranahans acted in an outrageous manner by falsely representing that Robert W.'s remains could not be viewed. Plaintiffs claim these tortious acts were committed by the Stranahans by their knowingly and deliberately conducting a private viewing for their own benefit without telling plaintiffs. They also claim the Stranahans excluded them from participation in the funeral. They assert that by publishing an obituary that described Robert W. and Maryann as the loving parents of Tracy Camac Shanahan but Robert Camac as the father of each of plaintiffs, this deliberate wording implied that plaintiffs were unloved by and did not love their father.
This appeal arises from the grant of summary judgment to defendants. A moving party is entitled to summary judgment if there is no genuine issue as to any material fact in the record. R. 4:46-2. In deciding a summary judgment motion, we apply the standard articulated by the Supreme Court in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995):
[A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
Therefore, we must assume plaintiffs' version of the facts is true and give plaintiffs the benefit of all favorable inferences. Id. at 535-36, 666 A.2d 146.
To prove a claim of intentional infliction of emotional distress, a plaintiff must prove:
(1) that the actor intended to inflict[ ] emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct ...;
(2) that the conduct was "extreme and outrageous";
(3) that the actions of the defendant were the cause of the plaintiff's distress ...; and
(4) that the emotional distress sustained by the plaintiff was severe.
[49 Prospect Street Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J.Super. 449, 474, 547 A.2d 1134 (App.Div.1988) (citation omitted).]
In this case, plaintiffs point to no evidence in the record that would prove the required elements to satisfy the elevated threshold of a claim for intentional infliction of emotional distress. None of plaintiffs ever requested a viewing of Robert W., and neither Tracy nor Michael told any of them that they could not have one. Further, there is no evidence that Tracy or Michael instructed anyone associated with Laughrey not to allow plaintiffs to have a viewing of Robert W.
Michael and Tracy did include several of plaintiffs in arrangements for the funeral and burial of Robert W. Indeed, the Stranahans did not bury Robert W. in New Jersey where they wanted to bury him. In order to reach a compromise with plaintiffs regarding the location of the burial, plaintiffs agreed to bury Robert W. at Gracelawn Cemetery in Delaware. When preparing the obituary, Michael called Leslie Ann to obtain information about the Camac family. This information was included in the obituary.
*465 Pursuant to the request of Joyce, Reverend Cordell spoke at the funeral. At the funeral, Michael asked Clinton and Leslie Ann if they would like to stand next to Robert W.'s casket. Michael asked Eugene if he or any of Robert W.'s sons would like to be pallbearers. As a result, Eugene and his son, Kevin, were both pallbearers.
Plaintiffs do not point to any evidence in the record that support their contention that the Stranahans intended to inflict emotional distress on them or that they acted in reckless disregard of a high probability that their actions would cause emotional distress. Although Tracy and Michael had a viewing of Robert W. and Maryann and plaintiffs did not, the Stranahans' conduct was not extreme or outrageous. Most of plaintiffs did not know Tracy or Michael and had never spoken to either of them prior to the death of Robert W. It was not extreme or outrageous conduct for the Stranahans to hold a private viewing without plaintiffs, many of whom were, in fact, strangers to them. Clinton testified during his deposition that, if he had been able to have a viewing of his father, it would have been acceptable for the Stranahans to have their own viewing.
The tort of intentional infliction of emotional distress requires emotional trauma that is severe. In Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 365-66, 544 A.2d 857 (1988), our Supreme Court noted the Restatement (Second) of Torts § 46 comment d (1965), as follows:
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
The Court explained that comment d indicates that liability may be imposed where: "The conduct [has been] `so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. at 366, 544 A.2d 857 (quoting Restatement (Second) of Torts, supra, § 46 comment d). We hold as a matter of law that the conduct referenced here does not meet the enhanced standard of outrage required by Buckley.
Plaintiffs assert a claim for negligent infliction of emotional distress. To prove negligent infliction of emotional distress, a plaintiff must prove that the "defendant's conduct was negligent and proximately caused plaintiff's injuries." Decker v. Princeton Packet, Inc., 116 N.J. 418, 429, 561 A.2d 1122 (1989). In order to do so, the plaintiff must prove that the defendant owed a duty of care to the plaintiff, which is analyzed in terms of foreseeability. Ibid. This is because "recovery for negligent infliction of emotional harm requires that it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons." Id. at 430, 561 A.2d 1122.
The Decker Court held that "foreseeability of injury is particularly important in the tort of negligent infliction of emotional harm. This reflects the concern over the genuineness of an injury consisting of emotional distress without consequent physical injury." Id. at 429, 561 A.2d 1122. Therefore, "there must be `an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious.'" Id. at 429-30, 561 A.2d 1122 (citation omitted). The Supreme Court held that a duty of care arises when a defendant should have foreseen "`fright or shock severe enough to cause substantial injury in a person normally constituted.'" *466 Id. at 429, 561 A.2d 1122 (quoting Caputzal v. Lindsay Co., 48 N.J. 69, 76, 222 A.2d 513 (1966)).
For a legal duty to attach, plaintiffs would have to show that it was foreseeable that they would suffer substantial emotional distress by not attending a private viewing of Robert W. Under New Jersey law, the question of whether a duty exists is a matter of law to be decided by the court, not the jury. See Essex v. New Jersey Bell Tel. Co., 166 N.J.Super. 124, 127, 399 A.2d 300 (App.Div.1979).
"In determining the duty of care that is owed a tort victim, courts are enjoined to consider and weigh matters of public policy. `The actual imposition of a duty of care and the formulation of the standards defining such a duty derive from considerations of public policy and fairness.'" Williamson v. Waldman, 150 N.J. 232, 245, 696 A.2d 14 (1997) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993)) (citation omitted).
We are satisfied, after a thorough examination of the record, that plaintiffs have failed to articulate legal support for their contention that the Stranahans owed a duty to notify them of the private viewing or to take any steps to insure that they participated in a public or private viewing. Plaintiffs had no legally-protected right to attend the viewing. The court below recognized the absence of New Jersey case law on this point. Nevertheless, other courts have addressed the matter and found no such duty exists.
In Seaton v. Commonwealth, 149 Ky. 498, 149 S.W. 871 (1912), a father buried his infant daughter himself, refusing to permit his relatives or his wife's relatives to be notified, and he did not have any services at the grave. The court stated:
His relatives and friends may have regarded this conduct on his part as a lack of consideration or respect for their feelings in the matter, but this is the extent of the bearing which his conduct, in this particular, can have upon the case. They had no legal right to be present. They may have been offended, because not notified or invited, but no ground of complaint is afforded to the public on this account.

[Id. at 873 (emphasis added).]
In this case, plaintiffs were obviously offended that they were not invited to the viewing. However, they had no legal right to attend the viewing, and the Stranahans had no legally-imposed duty to notify them of the viewing. Further, it was unforeseeable that plaintiffs would suffer severe emotional distress because they did not attend the private viewing of Robert W. and Maryann.
We conclude as a matter of law that it is unforeseeable that attending the funeral but not the private viewing of a family member will result in "`fright or shock severe enough to cause substantial injury in a person normally constituted.'" Decker, supra, 116 N.J. at 429, 561 A.2d 1122 (quoting Caputzal, supra, 48 N.J. at 76, 222 A.2d 513) (emphasis added).
Within the context of a familial relationship, a court will consider "the strength of [the] family ties" in assessing whether a defendant owes a duty to a plaintiff. Giardina v. Bennett, 111 N.J. 412, 419, 545 A.2d 139 (1988). As proffered to the court below, a number of plaintiffs admitted that they had not seen or even spoken with Robert W. in decades. Indeed, prior to the death of his father, Robert D. had not seen him in approximately thirty years and during those thirty years, he never attempted to speak with his father. Similarly, the last time Clinton, who is currently forty-one, saw his father, he was four or five years old. Leslie Ann, *467 who is currently forty-four years old, last saw her father, purely by chance, when she was sixteen years old, and thereafter made no attempt to contact him again during his lifetime. Given the lack of a substantial relationship between Robert W. and a number of plaintiffs and their lack of an effort to see their father while living, it was particularly unforeseeable that they would suffer any, much less severe, emotional distress by not attending the private viewing arranged by Tracy Stranahan for her side of the family.
It was also unforeseeable that the plaintiffs who had actually seen Robert W. in recent years would suffer severe emotional distress as a result of not attending the viewing. The Stranahans could not have foreseen that they would emotionally damage plaintiffs, most of whom the Stranahans did not even know, by not inviting them to the viewing to which they had invited only five close Stranahan family members. Plaintiffs never told the Stranahans of their desire to have a viewing, and the Stranahans never told them they could not have a viewing. Plaintiffs, or any of them, were free to request a viewing, but they chose not to do so. In view of their own inaction, there was no reason for the Stranahans to foresee that they would suffer any emotional distress.
As with plaintiffs' claim for intentional infliction of emotional distress, plaintiffs cannot prove their claim for negligent infliction of emotional distress because there is absolutely no evidence that their emotional distress was proximately caused by any actions that the Stranahans took. This is because in plaintiffs' deposition testimony, they cannot differentiate between the pain they suffered as a result of the death of Robert W. and the pain they allegedly suffered from not having a viewing.
Plaintiffs cannot prove the emotional distress that they contend to have suffered as a result of the Stranahans' conduct was severe and not idiosyncratic. Indeed, with the exception of Gail, who apparently was so severely affected that she had to seek treatment beginning two years after the death of her brother, none of the other plaintiffs have sought psychiatric or psychological care as a result of not viewing Robert W. Because plaintiffs did not receive any psychiatric or psychological care after learning of the private viewing, none of them have been diagnosed or can prove through medical professionals that they suffered a severe and disabling emotional or mental condition resulting from their failure to have a private viewing of Robert W. Additionally, none of them, including Gail, can distinguish between the emotional distress attributable to their father's/brother's death itself, his manner of death and to any actions attributable by them to the Stranahans.
We hold that the CFA does not apply to the misrepresentations alleged against Laughrey because (1) the misrepresentations alleged were not made to induce plaintiffs to contract with Laughrey for Robert W.'s funeral; (2) the emotional injuries alleged constitute non-economic damages that are not recoverable under the CFA; (3) plaintiffs have failed to prove as a matter of law that any actions attributable to Tracy or Michael Stranahan constitute extreme or outrageous conduct that caused severe emotional distress; and (4) plaintiffs have failed to prove as a matter of law that Tracy or Michael Stranahan breached a legally-imposed duty of care owed by them to plaintiffs that proximately caused damages legally recoverable for their emotional distress.
Affirmed.
NOTES
[1] Joyce Camac withdrew her participation in this appeal.
[2] Although the judge denied the motion for reconsideration, the judge permitted the record to be supplemented with (1) evidence as to Gail's nervous breakdown and emotional distress resulting in her hospitalization on the issue of emotional harm damages and (2) testimony as to Tracy having no contact with her parents for approximately six months prior to their death even though this evidence was available at the time of the motion for summary judgment. See R. 4:49-2; Cummings v. Bahr, 295 N.J.Super. 374, 384-85, 685 A.2d 60 (App.Div.1996).
[3] In Sportelli, Terese Jones and her husband, David, sought non-economic damages for Terese's pain and suffering and David's loss of consortium because of an IUD incorrectly inserted by defendant, Dr. Nicholas Sportelli, causing the perforation of Terese Jones' uterus, surgery for the removal of the IUD and an abortion as a result of her becoming pregnant while she suffered the perforation of her uterus. Sportelli, supra, 166 N.J.Super. at 385, 399 A.2d 1047. The Sportelli Court concluded: "Since monetary damages for pain and suffering are awarded because of a loss of good health and not on the basis of a loss of moneys or property, treble recompense for pain and suffering is not statutorily authorized and cannot be recovered. Likewise, since a loss of consortium is a loss of the company and affection of one's spouse, and again, not a loss of moneys or property, plaintiffs are not entitled to treble recompense for that loss either." Id. at 392, 399 A.2d 1047.